## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES | No. 3:16-cr-92 (SRU) |
| v. | |
| SHANNON CALHOUN | |

### RULING AND ORDER ON MOTION TO SUPPRESS

On the evening on April 13, 2016, several Bridgeport police officers breached the apartment where Shannon Calhoun was staying without first obtaining a warrant. They assert that their otherwise unlawful entry was justified by exigent circumstances. While in the apartment, officers identified various items of contraband, including a gun, a large amount of cash, and a baggie of what appeared to be cocaine.[1] The officers arrested Calhoun and later obtained a search warrant for the apartment on the basis of, *inter alia*, the contraband they had identified. A subsequent search pursuant to the warrant uncovered several firearms, ammunition, quantities of various controlled substances, and other indicia that Calhoun was involved in the drug trade. On the basis of that evidence, Calhoun was indicted for possession with intent to distribute cocaine base and MDMA in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and unlawful possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Calhoun moved to suppress the government's evidence against him. (doc. 31) A suppression hearing was held on February 7, 2017, and the parties submitted post-hearing briefs thereafter.

---

[1] As I discuss at length below, the circumstances of those discoveries are disputed.

Based on my findings of fact, set forth below, Calhoun's Fourth Amendment rights were violated when the police entered the apartment where he was staying without a warrant, and were further violated when they exceeded even the scope of the warrant exception they assert should have applied. Calhoun is therefore entitled to a suppression of the evidence found as a result of the warrantless search, and his motion is **granted**.

A.   Burden of Proof

"[T]he burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (collecting cases). "In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *United States v. O'Neill*, 2016 WL 6802644, at *8 (W.D.N.Y. Nov. 17, 2016) (citation omitted). "The standard of proof on the party who carries the burden is preponderance of the evidence." *Id*. Accordingly, the government has the burden to show that exigent circumstances justified the initial entry and search. *See United States v. Lopez*, 723 F. Supp. 229, 234 (S.D.N.Y. 1989).

B.   Findings of Fact

Around 10:16 p.m.[2] on April 13, 2016, two people called 911 to report shots fired in the vicinity of a CVS Pharmacy in Bridgeport, CT. Recording of 911 Calls, (Gov't Ex. 2). The second caller also stated that a man had threatened a woman in the parking lot, and had broken

---

[2] The timing is drawn from the Bridgeport Police Incident Report, submitted as government Exhibit 49. The government's witnesses explained at the hearing that the timestamps in the Report actually indicate when a centrally located operator entered a report of a call made by an officer, 911 caller etc., rather than a real time log of those calls as they occurred. Nevertheless, I rely on those timestamps insofar as they appear to be largely consistent with timeline indicated by the testifying officers, and provide at least an outer limit of the time between incidents. Accordingly, the times referred to in my findings of fact should be understood to be approximate.

the window of her car using a gun. The second caller asserted that she fled after the assault took

place and she heard shots fired in the area behind her. She described the aggressor as a stocky

black man in dark clothing, and stated that after he broke the car window he drove away in a

black BMW. (Gov't Exs. 2, 49) Around the same time, an off-duty police officer who lived in

the area called the Bridgeport Police Department to report that she heard shots fired and then saw

a black sports-utility vehicle drive quickly away from the area. (Gov't Ex. 49); *see also*

(Azevedo Test.). When an officer arrived at the CVS shortly thereafter, the owner of the car that

had been attacked identified the aggressor as Shannon Calhoun, and provided the officer with the

license plate number for his car as well as Calhoun's address, 49 Ridgewood Place, which was

approximately one block away. (Gov't Exs. 52, 53, and 54); *see also* (Martinez Test.). The car

was also registered at 49 Ridgewood Place.[3] None of the people interviewed at the CVS

indicated that Calhoun had been shot or was otherwise seriously injured, beyond the potential

injuries to his hand sustained as a result of punching through a car window. *See* (Gov't Exs. 53

and 54).

Officers Diaz and Ortiz arrived at 49 Ridgewood Place approximately five minutes[4] after

the initial calls. *See* Recording of Police Channel One (Gov't Ex. 1); Police Incident Report

(Gov't Ex. 49). A black BMW sedan was located outside of 49 Ridgewood Place (Gov't Ex. 6),[5]

and an officer confirmed that the hood of the car was warm, indicating that the car had recently

---

[3] It is somewhat unclear when the officers ran the plate number for the car. The Report appears to indicate that occurred *before* the officers arrived at 49 Ridgewood Place, whereas Officer Blackwell testified that they ran the plate after they had located the car, and thereby discovered that it was registered to that address.

[4] Because neither of the officers who first arrived at the scene testified at the hearing, timing in this paragraph is roughly approximated by the time between officers' statements on the Channel One recording; however, I note the government has not provided reliable evidence that the recording actually reflects real time.

[5] I note that the government's pictures depicting the state of the scene were take some time after these incidents occurred; as defense counsel pointed out, neither party has submitted or claims to possess photos or video taken contemporaneously with the initial discovery and search.

been driven, *see* (Gov't Ex. 1). A few minutes after locating the car, officers at the scene also identified a small amount of blood in the front portion of the driver's seat of the car, on the console, and on the gear shift. *See* (Gov't Exs. 7 and 8) (depicting a small amount of what appears to be blood on the gear shift, console, and driver's seat); *see also* (Gov't Ex. 49) (indicating a report of "fresh blood in front seat of [the BMW]"). Specifically, the officer who first reported seeing blood in the car over Channel One stated that there was "not a lot, only a couple of drops." (Gov't Ex. 1) Shortly thereafter, an officer stated that it was "definitely the suspect's vehicle." *Id.* An officer then identified Shannon Calhoun as "the suspect" over Channel One. *Id.*

Officer Blackwell responded to the call of shots fired, and arrived at 49 Ridgewood Place shortly thereafter. He was informed by officers already at the scene about the incident at the CVS involving the black BMW parked outside of the residence. (Blackwell Test.) He observed a few drops of what appeared to him to be "fresh blood" in the front seat of the car. *Id.* Blackwell and the other officers at the scene spent approximately fifteen minutes searching the area for shell casings. *See* (Gov't Ex. 49); (Blackwell Test.). None were found; however, in the course of that search, the officers discovered a single drop of what appeared to be fresh blood on the sidewalk approximately seven feet from the car, and three additional drops of blood on the porch outside the door of 49 Ridgewood Place. *See* (Gov't Exs. 11–13) (depicting drops of blood on sidewalk and porch). There was also a small amount of blood on the door handle and screen door of the residence. (Blackwell Test.); (Borona Test.) (describing the blood as a "smudge"). Blackwell saw a light on in the second floor of the residence. He pounded on the door and announced the police presence for approximately five minutes, receiving no response. Neither Blackwell nor

any other officer appears to have heard any noises from the residence or seen any indication of property damage or disruption other than the few small spots of blood.

Detective Borona also responded to the shots fired call. (Borona Test.) He initially went to the CVS, and arrived at 49 Ridgewood Place while Blackwell was pounding on the door of the residence. *Id.* Borona viewed the drops of blood inside the car and on the sidewalk, and then asked his sergeant for permission to breach the residence.[6]  Specifically, he stated that there was blood leading from the BMW to the residence, a possible injured party inside, and he thought that he had "exigency." *See* (Gov't Ex. 1). He breached the door and entered with a canine unit, followed by Blackwell.[7] (Blackwell Test.) Borona commanded any people in the residence to come out with their hands up.[8] (Borona Test.) Calhoun came out into the main hallway of the apartment with his hands up and was forced to the ground. *See* (Blackwell Test.); (Borona Test.) He had a bloody cut on his finger. Blackwell detained Calhoun with handcuffs and conducted a pat-down of Calhoun's person. (Blackwell Test.) The Incident Log indicates that Calhoun was arrested at or around 10:38 p.m., approximately two minutes after the breach and 20 minutes after the initial report of shots fired. *See* (Gov't Ex. 49); (Borona Test.) (confirming that approximate timing).

The officers then conducted a protective sweep of the residence. The government witnesses provided conflicting testimony regarding the precise sequence of that sweep. Both Blackwell and Borona stated that they observed additional blood on the floor of the bathroom. Blackwell asserted that he looked past the door of the front bedroom to assess whether any

---

[6] The residence is behind two doors—a front door to a landing and stairs, followed by a second, interior door into the living area. There was conflicting testimony regarding whether Borona was already inside the front door when he radioed his intention to breach.

[7] The exact order of entrance was unclear, but does not appear to be material to this motion.

[8] Blackwell also testified that Borona commanded that any people inside to "get on the ground." (Blackwell Test.)

threats or people needing assistance were present, and observed a large amount of money and what appeared to be a small bag of narcotics on the bed. (Blackwell Test.)

Borona also asserted that he conducted a protective sweep of the front bedroom, and stated that in the course of his sweep he saw "packaging material" on the bed. Borona subsequently clarified that "packaging material" referred to narcotics. (Borona Test.) He did not recall seeing Blackwell do a sweep of the front bedroom. Borona initially testified that he did not enter any of the other rooms because at that point he knew no one else was in the apartment. Sergeant Amato, however, testified that Borona was in the kitchen apparently after the scene had been secured. (Amato Test.) And when Borona was confronted with his inconsistent previous statement to the government that he had also seen a firearm with what appeared to be blood on it on the floor of a closet in the back bedroom, *see* (Gov't Exs. 26 and 28) (depicting gun in closet), Borona explained that he had seen that weapon during "a walk-through" conducted "*after the scene had been secured*." (Borona Test.) Borona then explained that the weapon had been identified by other, unidentified officers during the initial protective sweep. Detective Martinez similarly testified that he was called to the residence because officers had located a firearm, and that he was called to the scene to conduct a walk-through after the need for a protective sweep had ended in order to prepare a search warrant affidavit. (Martinez Test.) The gun that Martinez testified to having seen in the closet did not have blood on it. *Id.* He also testified that during the subsequent search conducted after the officers obtained a warrant, a different gun with blood residue on it was found, but he asserted that gun could not have been found in plain view. *Id.*

Sergeant Amato, a Gang Intelligence Sergeant who worked as a liaison to the State Police, heard the shots-fired call while doing unrelated paperwork. (Amato Test.) Amato testified that he decided to respond to the scene after hearing that Calhoun had been identified as the

"suspect" because Amato had had extensive previous dealings with Calhoun and thought he could offer assistance in identifying Calhoun if needed. Amato arrived after the scene was secured. *See* (Gov't Ex. 49) He testified that he saw Borona and Blackwell in the kitchen supervising Calhoun, who was in handcuffs. (Amato Test.) Amato also entered the front bedroom and saw narcotics and money on the bed, although he did not suggest that observation was made in the course of a protective sweep. Amato testified that he commented to Calhoun that it was "amazing that a domestic finally caught him," and then left the premises because it was "not his case."

Apparently at the conclusion of the protective sweep, Borona reported over Channel One that Calhoun was in custody. (Gov't Ex. 1) A person who appears to be the dispatcher stated that medics were available, and on that suggestion, Borona asked that medics be directed to the residence, although he asked for them to "hold off" briefly. *Id.* Borona further reported that Calhoun was "all bloody" and that "narcotics and cash" had been seen in the residence. *Id.* Neither Borona nor any other officer reported seeing a gun over Channel One.

None of the testifying officers (Blackwell, Borona, Martinez, or Amato) served as an affiant for the search warrant affidavit, although Martinez testified that he reviewed and approved it. The warrant affidavit has both small and larger differences from the officers' testimony at the hearing. *See* Warrant Aff., (Gov't Ex. 51) at 2–4. Most notably, it states that "the State Police Troop G reported that they received a call of a person shot at 49 Ridgewood Place," *id.* at ¶3, which call is also noted in the Police Incident Report, (Gov't Ex. 49); however, neither the Channel One recording nor any of the testifying officers indicated that report was relied on to assess the situation at 49 Ridgewood Place. The warrant affidavit also asserts that officers at the scene described "a heavy odor of marijuana" after they breached the door, which

none of the testifying officers described at the hearing. Warrant Aff. at ¶ 7. With respect to the contraband identified in the course of the protective sweep, the warrant affidavit lists a "black handgun with blood on it," that was allegedly observed in an open closet, as well as cash and a clear plastic bag with what appears to be cocaine in it. *Id.* On the basis of that affidavit, the police obtained a search warrant and found at the residence the considerable additional contraband that forms the basis of the instant charges.

Crime Scene Reports submitted on April 20, 2016 also stated that "a black handgun with blood on it" or a "gun" was found during a protective sweep. *See* Crime Scene Report Narrative at 1–2, (Gov't Ex. 51). One of those reports states all of the contraband on the floor of the closet, including the visible gun, was "found by Detective Martinez," whom I note did not testify to his involvement in any protective sweep. *Id.* at 7. It is unclear from the report when that discovery is asserted to have taken place. *Id.*

## II.      Discussion

Calhoun challenges the government's evidence on three primary grounds: first, the officers' entrance into the residence was not justified by the exigent circumstances exception to the Fourth Amendment's warrant requirement, which the parties agree is the only exception that potentially applied; second, if the officers were lawfully on the premises, their search nevertheless exceeded the scope of a permissible protective sweep under *Maryland v. Buie*, 494 U.S. 325 (1990); and third, that the contraband items described in the warrant affidavit were not found pursuant to the plain view doctrine. The government disagrees with Calhoun's factual contentions, and further asserts that even if the initial entrance of the officers was improper, any Fourth Amendment violation was cured by the inevitable discovery doctrine. Finally, the government contends that the good faith exception to the exclusionary rule applies.

For the reasons discussed below, I determine that the officers' entry was not justified by emergency circumstances. Taking the government's position here would result in a rule that allowed law enforcement to enter the residence of practically any person suspected of a gun-related crime, regardless of whether that person was believed to be injured. And while that rule might increase the effectiveness of law enforcement, it is simply not permitted under the Constitution. Moreover, there are strong indications that the Bridgeport Police Department blithely exceeded the permissible scope of a protective sweep in order to find additional evidence in this case, and, more troublingly, the Bridgeport Police Department may have a practice of doing so.

A. Exigent Circumstances

The warrantless entry into a home is presumptively unreasonable under the Fourth Amendment. *See Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984); *Payton v. New York*, 445 U.S. 573, 586 (1980). An arrest within the home is "simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances . . . even when probable cause is clearly present." *Payton*, 445 U.S. at 589. The government claims that the warrantless entry in this case was justified by exigent circumstances. The parties agree that the relevant exigency is described by the "emergency aid" doctrine, which has been articulated by the Supreme Court as follows:

> Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. This "emergency aid exception" does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid.

*Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (internal citations omitted) (quoting, *inter alia*,

*Brigham City v. Stuart*, 547 U.S. 398 (2006)). Thus, the defining characteristic of the emergency

aid doctrine is the officer's reasonable belief in an "urgent need to render aid or take action."[9]

*Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003) (internal quotation and citation

omitted). The reasonableness of an officer's belief that the situation was sufficiently urgent

"must be assessed in light of the particular circumstances confronting the officer at the time."

*Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir. 2001) (citing *Graham v. Connor*, 490

U.S. 386, 397 (1989)); *see also United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011).

A closer examination of the facts in *Fisher* and *Brigham City* is instructive. In *Fisher*,

officers responding to a complaint of a man "going crazy" inside of his residence arrived to find

"a household in considerable chaos: a pickup truck in the driveway with its front smashed,

damaged fenceposts along the side of the property, and three broken house windows, the glass

still on the ground outside." 558 U.S. at 45–46. In addition, officers may have seen blood on the

hood of the car, on clothes inside the car, and on the door to the property. *Id.* at 46. Inside the

house, officers could see Fisher "screaming and throwing things" and could see that he had a cut

on his hand. *Id.* In *Brigham City*, officers responding to a noise complaint saw minors drinking

outside a residence, heard shouting coming from inside, and then saw four adults attempting to

restrain a juvenile. 547 U.S. at 401. They then witnessed the juvenile punch one of the adults in

the face, and saw the victim "spitting blood into a nearby sink." *Id.* "The other adults continued

---

[9] I note that the emergency aid doctrine differs somewhat from other exigent circumstances analyses because it does not necessarily involve a suspicion of wrongdoing at the moment that the police take action, and accordingly, does not consider probable cause or the availability of a warrant. *See See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 560 (7th Cir. 2014); *see also United States v. Williams*, 2015 WL 429087, at *9 (W.D.N.Y. Feb. 2, 2015), *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. May 29, 2015) (discussing same).

to try to restrain the juvenile, pressing him up against a refrigerator with such force that the refrigerator began moving across the floor," at which point the officers entered to intervene. *Id.*

The *Fisher* Court identified three similarities between the facts in that case and in *Brigham City* supporting a "straightforward application of the emergency aid exception" in both cases: (1) the officers were "responding to a report of a disturbance;" (2) the officers encountered a "tumultuous situation" at the scene; and (3) the officers could see "violent behavior inside" that could have resulted in harm to the subject or others. *Fisher*, 558 U.S. at 48. Those three factors can be understood collectively as indications of an ongoing threat of violence. The *Fisher* Court also observed that the officers in that case had found "signs of a recent injury, perhaps from a car accident" outside the scene, and rejected the lower court's determination that those "mere drops of blood" were insufficient to signal a sufficiently serious injury. *Id.*

In the present case, there was no indication of an ongoing threat. According to the testimony of the officers, at least fifteen minutes had passed since the reports of shots fired and the assault. The officers had strong evidence that Calhoun, whom they identified as the "suspect" responsible for the disturbances several minutes before the breach, was inside his residence. During the period that the officers searched the area outside the residence—again, by Blackwell's testimony, a period of up to fifteen minutes—they heard no sounds coming from the residence and saw no signs of commotion or violence, and received no evidence of another person at risk inside the home.

The government's concession that the emergency aid doctrine, rather than other theories of exigency, is the operative one here provides an important insight into the situation. The government does not contend that the officers were in hot pursuit of Calhoun and chased him to his house. It is easy to look at these facts and be concerned by the ongoing threat Calhoun may

11

have posed to the people he assaulted and threatened to kill at CVS or by the danger to the community when shots are fired. But despite the fact that Calhoun's actions at CVS were abhorrent and violent, that situation had *ended* by the time the officers arrived at his residence. Unlike in other emergency aid cases involving domestic violence, by the time the officers entered, Calhoun had voluntarily distanced himself from his victims, he was not continuing to show signs of rage, violence, or instability, and he did not threaten the police when they made their presence known. *Compare Anthony v. City of N.Y.*, 339 F.3d 129, 136 (2d Cir. 2003) (officers received a 911 call from that address from a woman who claimed to be under attack); *Jackson v. City of N.Y.*, 29 F. Supp. 3d 161, 175–76 (E.D.N.Y. 2014) (officers received a distress call including report of gun and heard screaming from inside the house); *Hogan v. Buttofocco*, 2009 WL 3165765, at *1 (N.D.N.Y. Sept. 28, 2009), *aff'd*, 379 F. App'x 35 (2d Cir. 2010) (officers received a 911 call reporting domestic violence from a child, the potential victims were still inside the house, the house was in disarray, and aggressor resisted arrest); *see also City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1767 (2015) (emergency aid doctrine justified warrantless entry into residence of armed mentally-ill person threatening anyone attempting entry).

In the same vein, the reports of shots fired in the general area did not indicate an ongoing threat of violence at 49 Ridgewood Place. Contrary to the government's suggestion, the Fourth Amendment does not create a *per se* exception to the warrant requirement any time there is a report of shots fired nearby, even if the police believe they have located the person responsible for firing those shots; in every case, the totality of the circumstances must be examined. *C.f. Williams v. Cty. of Alameda*, 26 F. Supp. 3d 925, 938–39 (N.D. Cal. 2014) (holding that although reports of domestic violence should be taken seriously, they do not *per se* constitute exigency);

*Harris v. O'Hare*, 770 F.3d 224, 236 (2d Cir. 2014) (The "mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency.") (emphasis in original). In cases holding that a report of shots fired provided sufficient exigency to justify a warrantless entry, the officers had an objectively reasonably belief that victims would be found at that location because that was where the shots had been fired. *See United States v. Ashburn*, 2014 WL 1800409, at *5 (E.D.N.Y. May 6, 2014) (collecting cases where emergency aid doctrine justified entry to search for shooting victims where there was evidence that shots had been fired, such as the presence of bullet holes and casings at that location); *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008) (collecting cases holding same, where there were bullet holes, casings, or reports of shots fired at that location). In the present case, by contrast, the evidence available to the officers on location at the time of the breach did not provide any indication that shots had been fired at the residence.[10] Instead, all of the available evidence suggested that Calhoun fired shots at a *different* location and then fled to his residence. The shots fired were reported before Calhoun drove away from the CVS, *see* (Gov't Ex. 2); there were no bullet holes visible on the residence or in the car; and after roughly fifteen minutes of searching, the officers had not found any casings in the area around the residence.

Accordingly, the warrantless entry must be wholly premised on an objectively reasonable belief that Calhoun or someone else in the residence was in *urgent need* of medical attention or other police aid due to signs of recent injury outside of the residence. The government suggests that it was objectively reasonable for the officers to believe that Calhoun or someone else in the residence had suffered a gunshot wound based on the shots fired calls and the few drops of blood outside.

---

[10] As noted above, the breaching officers did not appear to be aware of or rely on the report to State Police Troop G that a person had been shot at 49 Ridgewood Place.

I first address the possibility that there was a third party at risk in the residence. At the hearing, the government suggested that its officers could have reasonably believed that Calhoun had shot a passenger in his car, perhaps taken that person hostage, and brought him or her into the residence. As in *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011), that speculative assertion is "untethered to any facts in the record." *Id.* at 158–59. By the time of the breach, officers had spoken to the victims at CVS, who suggested that Calhoun may have hurt his hand on the car window, but did not suggest that he had shot himself or another party there, posed a specific risk of violence to another person, or had, in the aftermath of an ugly domestic dispute, also seen fit to undertake a kidnapping when driving the one-block distance from the CVS to his residence. As noted above, officers had examined the car and seen no evidence that a shooting had taken place inside of it, and the small amount of blood they could see in the car was on the driver's seat and gearshift, not on any passenger seat where a kidnap victim would almost certainly have been held. And unlike in *Fisher*, where the Court held that officers could have reasonably believed Fisher's ongoing visible acts of violence were directed at other people in the residence, the officers in this incident were outside the residence for up to fifteen minutes without seeing or hearing any signs of commotion.

Finally, the evidence of recent injury found outside the residence was not sufficient to provide a reasonable belief of an *urgent need* for care. The government's witnesses stated that their decision to breach was based on the "trail of blood" leading up to the residence, but the evidence does not show such a trail. The government's photographic evidence shows at most six or seven small smears of blood on the front seat of the car, one drop on the sidewalk about seven feet away from the car, and three drops on the porch. When the officers first radioed in the discovery of blood in the car, they described it as "not a lot" of blood, did not call medics at that

time, and did not attempt to breach. It apparently took several more minutes to locate the drops

on the sidewalk and porch, and even after additional blood was located, officers did not call for

medical support. Indeed, medics were apparently summoned only on the suggestion of a

dispatcher after Calhoun and the residence had been secured. Additionally, those few drops of

blood was not accompanied by any other indicia of urgency. In *Fisher*, the Court held that an

officer could reasonably have concluded that the drops of blood on the car were the result of a

recent car accident and that if Fisher was the injured party, he was "in his rage" unable to

provide himself with care. 558 U.S. at 48–49; *see also Lagasse v. City of Waterbury*, 2011 WL

2709749, at \*11 (D. Conn. July 12, 2011) (sufficient urgency when officers "observed through a

partially opened door two bodies slumped over and unconscious on the floor" during what they

believed was an ongoing burglary). Here, the officers had fairly strong evidence that the blood

was the result of a cut to Calhoun's hand, and, at most, a plausible theory that Calhoun might

have accidently grazed himself with a bullet. They had no indication that he was in an ongoing

rage that would prevent him from obtaining care for himself. To the extent that the officers relied

on Calhoun's failure to respond to their requests for entry as a sign of urgency, they seem to

forget that they had already identified Calhoun as a "suspect" in a recent violent assault and

accordingly, his silence was far more likely to be a result of his desire not to be arrested.

The emergency aid doctrine does not require "ironclad proof of a 'likely serious, life-

threatening' injury," *Fisher*, 558 U.S. at 49 (quoting *Brigham City*, 547 U.S. at 406), nor is a

failure to immediately call for medics fatal to an emergency aid claim, *see id.*; nevertheless, the

officers' objectively reasonable belief must be based on something more than speculation and the

government has not shown that to be the case here. *See Simmons*, 661 F.3d at 158; *see also*

*Williams v. Cty. of Alameda*, 26 F. Supp. 3d 925, 938 (N.D. Cal. 2014) ("Defendants must point

to 'specific and articulable' facts which, taken together with rational inferences, support the warrantless intrusion.") (quoting *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987)).

    In sum, I find that the officers' warrantless entry into 49 Ridgewood was not justified by the emergency aid doctrine. The government has not pointed to any other reason why a warrantless entry would be permitted in this case, nor did it provide evidence that it would have been impracticable to wait for Calhoun and arrest him upon his exit from the residence or to obtain a warrant for his arrest. For the sake of completeness, however, I will also discuss the scope of the officers' search within the residence before considering the implications of this finding for Calhoun's suppression motion.

### B.  Scope of Search Incident to Emergency Aid

    Even if the officers had been entitled to enter the residence under the emergency aid doctrine, their search of the premises also appears to have exceeded the permissible scope in several concerning ways.

    The Supreme Court held in *Maryland v. Buie*, 494 U.S. 325 (1990), that arresting officers are permitted to engage in a protective sweep incident to an arrest warrant to ensure their safety. *Id.* at 334. The sweep must be justified by the circumstances, and limited to those spaces where a person, or other source of harm, could be found, and it must last "no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335–36. The Second Circuit has extended *Buie* to circumstances where "officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant, at least where their presence may expose the officers to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant." *United States v. Miller*, 430 F.3d 93, 99 (2d Cir. 2005); *see also United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (holding that when officers have made a warrantless

16

entry pursuant to exigent circumstances, any accompanying "warrantless search 'must be strictly circumscribed by the exigencies which justify its initiation.'") (quoting *Mincey v. Arizona,* 437 U.S. 385, 393 (1978)).

As a preliminary matter, it is important to note that not all of the officers who were apparently involved in searching Calhoun's residence before a warrant was obtained have even attempted to argue that they were engaged in a protective sweep as a result of exigent circumstances. Blackwell and Borona entered at least under the pretense of some exigency. Martinez and Amato both frankly admitted in their testimony that they arrived after the scene had been secured. Amato suggested in his testimony that he drove across town and arrived on the scene solely so that he could witness Calhoun being arrested. Still more concerningly, Martinez's testimony suggests that he is *routinely* called to do a walk-through after a protective sweep has been completed in order to better identify any guns seen on the premises. The practice of parading additional officers through a home after all agreed that the scene has been secured and without any other applicable exception to the warrant requirement appears to be plainly unconstitutional. *See Azana v. City of W. Haven*, 2012 WL 264559, at *7 (D. Conn. Jan. 27, 2012) (denying summary judgment on the issue of qualified immunity where the evidence could show that officers further intruded into a residence after the exigent circumstances had been resolved). Moreover, allowing expert-officers to "double-check" the accuracy and details of what other officers saw when they were conducting a protective sweep in order to strengthen a warrant affidavit belies the very foundation of the "plain view" exception, which is the "immediately apparent" nature of the contraband. *See Horton v. California*, 496 U.S. 128, 136 (1990). As a result of the officers' admitted decision to walk through the residence after the scene was

secured, there is now considerable doubt about what the other officers could have seen legitimately in the course of a protective sweep.

Had the officers who made the initial breach and warrantless entry done so legally pursuant to the emergency aid doctrine, they clearly would have been entitled to conduct a protective sweep of the residence. And there is no evidence beyond Calhoun's affidavit that those officers exceeded the scope of *Buie* by opening boxes and bags. *See United States v. Murray*, 2015 WL 7871358, at *4 (W.D.N.Y. Dec. 4, 2015) (giving little weight to a defendant's affidavit supporting a suppression motion not subject to cross-examination, collecting cases doing same); *see also United States v. Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999) (observing that, "in practice, the self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing"). But the government's witnesses offered inconsistent testimony regarding how much of the residence was searched and by whom before the officers themselves concluded that the need for a protective sweep had ended. For instance, Amato testified that Borona was in the kitchen when he arrived, but Borona testified that he only conducted a protective sweep of the front bedroom and bathroom before determining that there were no additional people in the residence. After a previous statement had refreshed his recollection, Borona also testified that he had been present in a back bedroom of the house, but he did not amend his earlier statement that he believed the need for a protective sweep had ended with his search of the other two rooms.

The government's evidence thus indicates that the officers' search of the residence lasted considerably "long[er] than [was] necessary to dispel the reasonable suspicion of danger," *Buie*,

494 U.S. at 335–36, and in fact amounted to wanton disregard for the limitations of a permissible protective sweep.[11]

### C. Scope of Suppression

Having concluded that the warrantless entry into 49 Ridgewood Place was unlawful, I must now determine whether any evidence should be suppressed as fruit of the poisonous tree under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994). "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States,* 487 U.S. 533, 536–37 (1988) (internal citations omitted).

The government argues that the exclusionary rule should not apply in this case either because the physical evidence[12] would have been found under the inevitable discovery doctrine, or because the officers' violation of the Fourth Amendment was the result of negligence and accordingly does not require the strong deterrence imposed by the exclusionary rule. Calhoun asserts that because the government did not raise either of those arguments until its closing

---

[11] Calhoun further argues that, in addition to exceeding the scope of a permissible protective sweep, the officers also improperly removed contraband from Calhoun's pockets and placed it on a bed in order to provide more support for their search warrant application. The only evidence of impropriety beyond Calhoun's affidavit, however, is Blackwell and Borona's potentially inconsistent testimony regarding who checked the front bedroom and saw the contraband on the bed, and I find that is insufficient to support Calhoun's account.

The government's response, however, raises additional concerns—it asserts in its brief that there would have been no need for the officers to fabricate plain view evidence because "Borona had seen a gun in the back room closet." Gov't Opp'n Br. at 14. As discussed above, Borona's testimony regarding his discovery of a gun with blood on the handle on the floor of a closet in the back bedroom changed over the course of the hearing, and was inconsistent with the testimony of Martinez, who testified to the discovery of a different gun; moreover, Borona did not explain why neither gun was called in when Borona reported his discovery of other contraband over Channel One. And while they may not have material implications in this case, those inconsistencies remain concerning.

[12] The government does not appear to be arguing that any verbal statements Calhoun made during the warrantless entry, such as his alleged statement that "everything in the house is mine," would fall under the inevitable discovery doctrine or any other exception to the exclusionary rule.

arguments and post-hearing briefing, respectively, they should be deemed waived. I agree that the government's late invocation of those doctrines is not ideal, but I nevertheless determine that I may consider whether they apply here. *See United States v. Simmons*, 861 F. Supp. 2d 307, 312 n.5 (S.D.N.Y. 2012), *aff'd,* 543 F. App'x 101 (2d Cir. 2013) (where government raised inevitable discovery doctrine for the first time after remand, observing "that if the Court may consider new evidence it surely can consider a new legal theory based on the evidence that was before the Court at the time of the suppression hearing").

1. *Inevitable Discovery Doctrine*

"Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix v. Williams,* 467 U.S. 431, 447 (1984)). "[I]llegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Id.* at 60. The government has the burden to establish inevitability by a preponderance of the evidence. *Id.* at 58 n.6 (quoting *Nix*, 467 U.S. at 444); *see also id.* (discussing the "semantic problems in using the preponderance of the evidence standard to prove inevitability").

In the context of a warrantless search, *United States v. Lavan*, 10 F. Supp. 2d 377 (S.D.N.Y. 1998), collects a useful list of the contingencies to be considered, including:

> whether a warrant would have been sought, whether a warrant would have issued, whether the warrant would have specified the articles seized, whether the articles would have remained in place by the time the warrant

> would have been executed, and whether the articles would have been
> found in the hypothetical warranted search . . . .

*Id.* at 389 (discussing, *inter alia*, *United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir. 1995)). The

government's argument here relies heavily on the clear existence of probable cause to arrest

Calhoun and to search for the weapon used to commit the assault, but fails to take most of

*Lavan*'s remaining contingencies into account.[13] *See Heath*, 455 F.3d at 58 ("[E]vidence that an

arrest would have been supported by probable cause and, therefore, could legally have taken

place, only makes the inevitable discovery doctrine potentially applicable."). In particular, the

government wholly relies on cases in which the defendant was already legitimately in police

custody and/or the premises to be searched were already functionally under police control and

supervision when the improper search occurred. *See, e.g.*, *United States v. Whitehorn*, 829 F.2d

1225, 1228 (2d Cir. 1987) (agent was guarding the apartment after defendant was taken into

custody); *United States v. Wolfe*, 2015 WL 8780544, at *5 (D. Vt. Dec. 15, 2015) (observing that

"the scene inside was frozen and unlikely to change during the time it took to apply for a search

warrant"); *United States v. Levasseur*, 620 F. Supp. 624, 627 (E.D.N.Y. 1985), *abrogated on

other grounds by United States v. Heath*, 455 F.3d 52 (2d Cir. 2006) (house was searched for

hidden persons before the illegal search, and agent testified that "he could have withdrawn all

law enforcement persons to a safe distance from the house and kept it under surveillance"). The

government accordingly fails to recognize that, in the absence of the warrantless entry, Calhoun

would not have been secured and arrested during the period in which a search warrant was

obtained, and so evidence—particularly the evidence of drug-dealing wholly unrelated to the

assault charge for which the police had probable cause—could have been destroyed or hidden

---

[13] Taken to its logical limit, the government's position would support a rule that no warrant is required when one could be obtained. That is not the law.

during that time. *See Cabassa*, 62 F.3d at 474 (holding, *inter alia*, that the "likely" possibility that "evidence might disappear before the issuance or execution of a warrant" undermined the applicability of the inevitable discovery doctrine).

The government has failed to account for any number of contingencies that could have occurred before a search warrant was obtained. For instance, Calhoun could have left his house and been arrested while the weapon he used for the assault was on his person, thus obviating the need for a further search. *See United States v. Stokes*, 733 F.3d 438, 446 (2d Cir. 2013) (contemplating similar hypothetical where arrest would end the basis for searching the target premises). His mother, who also lived in the residence and whom the police had no reason to search, could have carried some or all of the evidence out of the apartment to a different location before the warrant was obtained. *See id.* (contemplating similar hypothetical where the target motel room had multiple registered guests). And there are further uncertainties regarding how a search pursuant to a warrant would have unfolded—for instance, because the search warrant likely would only have authorized a search for the gun used in the assault and other evidence related to that assault, it is uncertain whether and to what extent evidence of narcotics and the other weapons would have remained in plain view or would otherwise have been uncovered in the scope of that search. *See* 2 Wayne LaFave, *Search and Seizure* § 4.10(d) (5th ed. 2016) ("When the purposes of the warrant have been carried out, the authority to search is at an end."); *see also United States v. Canestri*, 518 F.2d 269, 274 (2d Cir. 1975) (holding that discovery of additional contraband was within the authorized scope of the search because the officers were "still looking" for the subject of the search warrant).

I can only speculate about the likelihood that any of those scenarios would have occurred, and, as the Second Circuit observed in *United States v. Stokes*, 733 F.3d 438 (2d Cir. 2013), "that

is precisely the problem: a finding of 'inevitable' discovery cannot rest on speculation about what [Calhoun] might or might not have done." *Id.* at 446. Because there was nothing inevitable about what would have been discovered absent the unlawful entry, the inevitable discovery doctrine does not apply here.

2. *Applicability of the Exclusionary Rule / Good Faith Exception*

Finally, I take up the government's argument that the exclusionary rule should not apply here because the officers' misconduct was the result of "isolated negligence," and accordingly application of the rule would not result in "appreciable deterrence." Gov't Opp'n Br. at 7 (discussing *Herring v. United States*, 555 U.S. 135, 139–40 (2009)).

"[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct [violating the Fourth Amendment], or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. Accordingly, the exclusionary rule is not a "necessary consequence of a Fourth Amendment violation," *id.* at 141; instead, courts deciding whether to impose that remedy must "focus[] on the efficacy of the rule in deterring Fourth Amendment violations in the future," and ensure that the "the benefits of deterrence . . . outweigh the costs" of its application, *id.* "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143; *see also Davis v. United States*, 564 U.S. 229, 240 (2011) (emphasizing the importance of police culpability in triggering the exclusionary rule). Thus far, in cases where the Supreme Court has determined that a "good faith" exception to the exclusionary rule should apply, the law enforcement officer responsible for the Fourth Amendment violation was unknowingly relying on errors made by others, such as warrants obtained using erroneous information, or statutes or judicial precedents later held to be invalid. *See Davis*, 546 U.S. at 238–39 (collecting cases); *see also United States v. Mota*, 155 F.

23

Supp. 3d 461, 475 (S.D.N.Y. 2016) ("The common thread uniting these exceptions is that it was not the officer conducting the search who erred, but another actor, such as the legislature.") (citing *Davis*, 546 U.S. at 240–41).

There is no comparable reliance in the present case. The government does not argue that the breaching officers acted innocently on misinformation or that they relied on a now-overturned precedent.[14] More importantly, it is fairly clear that the officers knew they had probable cause and could have obtained both an arrest warrant and a search warrant, but chose not to do so. *See Stokes*, 733 F.3d at 443–44 (applying the exclusionary rule where officers had probable cause, could have arrested the defendant in public, and made a "deliberate strategic choice" not to do so). They were already referring to Calhoun as a "suspect" before they breached his residence.[15] *See* (Gov't Ex. 1). As I discussed at length above, they had no reasonably objective basis to believe he needed urgent medical care or posed an urgent threat to others. They simply chose not to wait for Calhoun to come outside or for the process to obtain a warrant to run its course.

---

[14] The government suggests that I could find that the breaching officers acted in good faith based on a reasonable mistake of law. *See* Gov't Post Hearing Br. at 10 (discussing *Heien v. North Carolina*, ⸺ U.S. ⸺, 135 S. Ct. 530 (2014)). In *Heien*, the Supreme Court held that "[t]he Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or law—must be *objectively* reasonable." *Id.* at 539 (emphasis in original). The *Heien* Court, however, was considering whether an officer's reasonable mistake of law meant that there had been "no violation of the Fourth Amendment in the first place," rather than whether the exclusionary rule should be imposed as the proper remedy for that violation. *Id.* Accordingly, the inquiry contemplated in *Heien* has already been conducted through my previous determination that a Fourth Amendment violation did occur here.

 Moreover, the emergency aid doctrine already requires a consideration whether the officers had an "objectively reasonable" basis for their belief that the situation required urgency. *See Fisher*, 558 U.S. at 47. The government's mistake of law argument thus urges that, although the officers did not have an objectively reasonable basis for that belief, they *did* have an objectively reasonable belief that their belief in an emergency would be found to be objectively reasonable. That argument is nonsensical bootstrapping.

[15] Sergeant Amato's testimony further suggests that Calhoun was well-known to the Bridgeport Police Department and that Amato, at least, expected to find evidence of other crimes in the residence, although it is unclear the extent to which the breaching officers were aware of that history.

24

In cases like the present one, where the available evidence is strong enough that a warrant would obviously have issued, and where Calhoun's actions and his unlawful possessions suggest his participation in shocking violence, it is tempting to give the police a pass for their search. But the Fourth Amendment requires otherwise. Imposing the exclusionary rule here underscores that even those people credibly suspected of committing serious crimes are entitled to privacy in their homes absent exigent circumstances or the issuance of a warrant. Conversely, admitting the contested evidence could undercut the deterrent effect of the exclusionary rule by encouraging other officers to view probable cause that an individual recently committed a violent crime as obviating the need for a warrant.

I also note that because of the nature of the officers' Fourth Amendment violation, the costs of imposing the exclusionary rule are somewhat reduced—because the officers already had independent probable cause to arrest Calhoun. Unlike in the hypothetical case imagined by the *Herring* Court, Calhoun almost certainly will not "go free" simply because his suppression motion is granted. 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 908 (1984)). Even without the contraband seized at his residence, there appears to be ample evidence that Calhoun was in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and that he used that weapon to assault and threaten to kill three women and to damage their property. Those are serious offenses—in fact, some would argue that brandishing a firearm and threatening to kill three people is much more serious than drug-dealing.

At the hearing, the government suggested that another cost of imposing the exclusionary rule in this case is that it could have the effect of causing officers to hesitate before providing aid out of concern that the emergency aid doctrine would not apply. But the emergency aid doctrine, unlike other theories of exigency, contemplates a calculation that does not take into account the

25

possible criminal conduct of the person believed to be in need—it is aimed at the provision of medical care and harm prevention, rather than the identification of suspects and evidence. Thus, exclusion of evidence from a criminal trial should have no effect on the willingness of officers to render emergency aid.

In sum, I conclude that the deterrent effect of imposing the exclusionary rule easily outweighs its costs in this case. Accordingly, any verbal and physical evidence obtained during the warrantless search of Calhoun's residence is suppressed.

## III.     Conclusion

Calhoun's motion to suppress (doc. 31) is **granted**.


So ordered.

Dated at Bridgeport, Connecticut, this 16th day of February 2017.


<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge