# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES

v.

SHANNON CALHOUN

No. 3:16-cr-92 (SRU)

## AMENDED RULING AND ORDER ON MOTION TO SUPPRESS

On the evening on April 13, 2016, several Bridgeport police officers breached the apartment where Shannon Calhoun was staying without first obtaining a warrant. They assert that their otherwise unlawful entry was justified by exigent circumstances. While in the apartment, officers identified various items of contraband, including a gun, a large amount of cash, and a baggie of what appeared to be cocaine.[1] The officers arrested Calhoun and later obtained a search warrant for the apartment on the basis of, *inter alia*, the contraband they had identified. A subsequent search pursuant to the warrant uncovered several firearms, ammunition, quantities of various controlled substances, and other indicia that Calhoun was involved in the drug trade. On the basis of that evidence, Calhoun was indicted for possession with intent to distribute cocaine base and MDMA in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and unlawful possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Calhoun moved to suppress the government's evidence against him. (doc. 31) A suppression hearing was held on February 7, 2017, and the parties submitted post-hearing briefs thereafter.

---

[1] As I discuss at length below, the circumstances of those discoveries are disputed.

On February 16, 2017, I issued a Ruling and Order granting Calhoun's motion to suppress in full. (doc. 53) The government subsequently filed a motion for reconsideration of that ruling, raising issues that had not previously been considered. (doc. 61) That motion is **granted**; the result of that reconsideration, however, is this Amended Ruling and Order (replacing doc. 53) in which I again conclude that all of the evidence uncovered during the warrantless search should be suppressed.

A. Burden of Proof

"[T]he burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (collecting cases). "In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *United States v. O'Neill*, 2016 WL 6802644, at *8 (W.D.N.Y. Nov. 17, 2016) (citation omitted). "The standard of proof on the party who carries the burden is preponderance of the evidence." *Id*. Accordingly, the government has the burden to show that exigent circumstances justified the initial entry and search. *See United States v. Lopez*, 723 F. Supp. 229, 234 (S.D.N.Y. 1989).

B. Findings of Fact

Around 10:16 p.m.[2] on April 13, 2016, two people called 911 to report shots fired in the vicinity of a CVS Pharmacy in Bridgeport, CT. Recording of 911 Calls, (Gov't Ex. 2). The

---

[2] The timing is drawn from the Bridgeport Police Incident Report, submitted as government Exhibit 49. The government's witnesses explained at the hearing that the timestamps in the Report actually indicate when a centrally located operator entered a report of a call made by an officer, 911 caller or the like rather than a real time log of those calls as they occurred. Nevertheless, I rely on those timestamps insofar as they appear to be largely consistent with the timeline indicated by the testifying officers, and provide at least an outer limit of the time between incidents. Accordingly, the times referred to in my findings of fact should be understood to be approximate.

second caller also stated that a man had threatened a woman in the parking lot, and had broken the window of her car using a gun. The second caller asserted that she fled after the assault took place and she heard shots fired in the area behind her. She described the aggressor as a stocky black man in dark clothing, and stated that after he broke the car window he drove away in a black BMW. (Gov't Exs. 2, 49) Around the same time, an off-duty police officer who lived in the area called the Bridgeport Police Department to report that she heard shots fired and then saw a black sports-utility vehicle drive quickly away from the area. (Gov't Ex. 49); *see also* (Azevedo Test.). When an officer arrived at the CVS shortly thereafter, the owner of the car that had been attacked identified the aggressor as Shannon Calhoun, and provided the officer with the license plate number for his car as well as Calhoun's address, 49 Ridgewood Place, which was approximately one block away. (Gov't Exs. 52, 53, and 54); *see also* (Martinez Test.). The car was also registered at 49 Ridgewood Place.[3] None of the people interviewed at the CVS indicated that Calhoun had been shot or was otherwise seriously injured, beyond the potential injuries to his hand sustained as a result of punching through a car window.[4] *See* (Gov't Exs. 53 and 54).

---

[3] It is somewhat unclear when the officers ran the plate number for the car. The Report appears to indicate that occurred *before* the officers arrived at 49 Ridgewood Place, whereas Officer Blackwell testified that they ran the plate after they had located the car, and thereby discovered that it was registered to that address.

[4] In its Motion for Reconsideration, the government asserts that there is no evidence in the record to support my factual finding that the breaching officers were aware that Calhoun had smashed a window with his hand at the time of the breach. *See* Gov't Mot. for Recon. at 4 n.1. That assertion is contradicted by evidence presented at the suppression hearing. In the Channel One recording, before any officer reports arriving at 49 Ridgewood Place, a dispatcher describes the events at CVS as follows:

> Alright, we're getting a call from CVS, uh, responsible possibly a small BMW, a black male, stocky, dark colored clothing, was on scene breaking a female's windows on a vehicle there. The complainant fled and then they heard shots fired coming from that area. May be a responsible party.

Officers Diaz and Ortiz arrived at 49 Ridgewood Place approximately five minutes[5] after the 911 calls. *See* Recording of Police Channel One (Gov't Ex. 1); Police Incident Report (Gov't Ex. 49). A black BMW sedan was located outside of 49 Ridgewood Place (Gov't Ex. 6),[6] and an officer confirmed that the hood of the car was warm, indicating that the car had recently been driven, *see* (Gov't Ex. 1). A few minutes after locating the car, officers at the scene also identified a small amount of blood in the front portion of the driver's seat of the car, on the console, and on the gear shift. *See* (Gov't Exs. 7 and 8) (depicting a small amount of what appears to be blood on the gear shift, console, and driver's seat); *see also* (Gov't Ex. 49) (indicating a report of "fresh blood in front seat of [the BMW]"). Specifically, the officer who first reported seeing blood in the car over Channel One stated that there was "not a lot, only a

---

Gov't Ex. 1 at 2:10–2:30. Shortly thereafter on the recording, a responding officer and the dispatcher had the following exchange:

> 17 to radio. I don't know if you copy that, I've diverted myself, going up Main Street right now. You said he, uh, popped somebody, he fled in a Beemer, a black Beemer?

> Yeah, it was being operated by a black male, stocky, in dark clothing. They didn't say which direction.

*Id.* at 3:20–3:33. In keeping with that evidence, in its closing argument, the government, apparently describing the factors that would support an officers' reasonable belief in an emergency situation inside of the residence prior to the breach, argued that: "at this point, [the officers] know—well, they know he broke the window. They don't know he was injured in that." Tr. at 129–30. The government has subsequently asserted that was a misstatement of the evidence because the exhibits cited in the course of that argument were witness statements taken after the breach occurred; nevertheless, my factual finding that the officers did know Calhoun had broken a window is supported by the Channel One recording. The Channel One transmissions are directed to all officers, including the officers responding to 49 Ridgewood Place.

[5] Because neither of the officers who first arrived at the scene testified at the hearing, timing in this paragraph is roughly approximated by the time between officers' statements on the Channel One recording; however, I note the government has not provided reliable evidence that the recording actually reflects real time.

[6] I note that the government's pictures depicting the state of the scene were taken some time after these incidents occurred; as defense counsel pointed out, neither party has submitted or claims to possess photos or video taken contemporaneously with the initial discovery and search.

couple of drops." (Gov't Ex. 1) Shortly thereafter, an officer stated that it was "definitely the suspect's vehicle." *Id.* An officer then identified Shannon Calhoun as "the suspect" over Channel One. *Id.*

Officer Blackwell responded to the call of shots fired, and arrived at 49 Ridgewood Place shortly thereafter. He was informed by officers already at the scene about the incident at the CVS involving the black BMW parked outside of the residence. (Blackwell Test.) He observed a few drops of what appeared to him to be "fresh blood" in the front seat of the car. *Id.* Blackwell and the other officers at the scene spent approximately fifteen minutes searching the area for shell casings. *See* (Gov't Ex. 49); (Blackwell Test.). No casings were found; however, in the course of that search, the officers discovered a single drop of what appeared to be fresh blood on the sidewalk approximately seven feet from the car, and three additional drops of blood on the porch outside the door of 49 Ridgewood Place. *See* (Gov't Exs. 11–13) (depicting drops of blood on sidewalk and porch). There was also a small amount of blood on the door handle and screen door of the residence. *See* (Blackwell Test.); (Borona Test.) (describing the blood as a "smudge"). Blackwell saw a light on in the second floor of the residence. He pounded on the door and announced the police presence for approximately five minutes, receiving no response. Neither Blackwell nor any other officer appears to have heard any noises from the residence or seen any indication of property damage or disruption other than the few small spots of blood.

Detective Borona also responded to the shots fired call. (Borona Test.) He initially went to the CVS, and arrived at 49 Ridgewood Place while Blackwell was pounding on the door of the residence. *Id.* Borona viewed the drops of blood inside the car and on the sidewalk, and very

shortly thereafter asked his sergeant for permission to breach the residence.[7]  Specifically, he stated that there was blood leading from the BMW to the residence, a possible injured party inside, and he thought that he had "exigency."[8] *See* (Gov't Ex. 1). He breached the door and entered with a canine unit, followed by Blackwell.[9] (Blackwell Test.) Borona commanded any people in the residence to come out with their hands up.[10] (Borona Test.) Calhoun came out into the main hallway of the apartment with his hands up and was forced to the ground. *See* (Blackwell Test.); (Borona Test.) He had a bloody cut on his finger. Blackwell detained Calhoun with handcuffs and conducted a pat-down of Calhoun's person. (Blackwell Test.) The Incident Log indicates that Calhoun was arrested at or around 10:38 p.m., approximately two minutes after the breach and 20 minutes after the initial report of shots fired. *See* (Gov't Ex. 49); (Borona Test.) (confirming that approximate timing).

The officers then conducted a protective sweep of the residence. The government witnesses provided conflicting testimony regarding the precise sequence of that sweep. Both Blackwell and Borona stated that they observed additional blood on the floor of the bathroom. Blackwell asserted that he looked past the door of the front bedroom to assess whether any threats or people needing assistance were present, and observed a large amount of money and what appeared to be a small bag of narcotics on the bed. (Blackwell Test.)

---

[7] The residence is behind two doors—a front door to a landing and stairs, followed by a second, interior door into the living area. There was conflicting testimony regarding whether Borona was already inside the front door when he radioed his intention to breach.

[8] As indicated by the discussion below, I do not find Borona's claim that he believed there was a real emergency requiring forced entry to be credible.

[9] The exact order of entrance was unclear, but does not appear to be material to this motion.

[10] Blackwell also testified that Borona commanded that any people inside to "get on the ground." (Blackwell Test.)

Borona also asserted that he conducted a protective sweep of the front bedroom, and stated that in the course of his sweep he saw "packaging material" on the bed. Borona subsequently clarified that "packaging material" referred to narcotics. (Borona Test.) He did not recall seeing Blackwell do a sweep of the front bedroom. Borona initially testified that he did not enter any of the other rooms because at that point he knew no one else was in the apartment. Another officer, however, testified that Borona was in the kitchen apparently after the scene had been secured. (Amato Test.) And when Borona was confronted with his inconsistent previous statement to the government that he had also seen a firearm with what appeared to be blood on it on the floor of a closet in the back bedroom, *see* (Gov't Exs. 26 and 28) (depicting gun in closet), Borona explained that he had seen that weapon during "a walk-through" conducted "*after the scene had been secured*." (Borona Test.) Borona then explained that the weapon had been identified by other, unidentified officers during the initial protective sweep.

Detective Martinez also testified that he was called to the residence because officers had located a firearm, and that he was called to the scene to conduct a walk-through after the need for a protective sweep had ended in order to prepare a search warrant affidavit. (Martinez Test.) The gun that Martinez testified to having seen in the closet did not have blood on it. *Id.* He also testified that during the subsequent search conducted after the officers obtained a warrant, a different gun with blood residue on it was found, but he asserted that gun could not have been found in plain view. *Id.*

Sergeant Amato, a Gang Intelligence Sergeant who worked as a liaison to the State Police, heard the shots-fired call while doing unrelated paperwork. (Amato Test.) Amato testified that he decided to respond to the scene after hearing that Calhoun had been identified as the "suspect" because Amato had had extensive previous dealings with Calhoun and thought he

7

could offer assistance in identifying Calhoun if needed. Amato arrived after the scene was secured. *See* (Gov't Ex. 49). When he entered he saw Borona and Blackwell in the kitchen supervising Calhoun, who was in handcuffs. (Amato Test.) Amato also entered the front bedroom and saw narcotics and money on the bed, although he did not suggest that observation was made in the course of a protective sweep. Amato commented to Calhoun that it was "amazing that a domestic finally caught him," and then left the premises because it was "not his case." *Id.*

Apparently at the conclusion of the protective sweep, Borona reported over Channel One that Calhoun was in custody. (Gov't Ex. 1) A person who appears to be the dispatcher stated that medics were available, and on that suggestion, Borona asked that medics be directed to the residence, although he asked for them to "hold off" briefly. *Id.* Borona further reported that Calhoun was "all bloody" and that "narcotics and cash" had been seen in the residence. *Id.* Neither Borona nor any other officer reported seeing a gun over Channel One.

None of the testifying officers (Blackwell, Borona, Martinez, or Amato) served as an affiant for the search warrant affidavit, although Martinez testified that he reviewed and approved the application. The warrant affidavit has both small and larger discrepancies from the officers' testimony at the hearing. *See* Warrant Aff., (Gov't Ex. 51) at 2–4. Most notably, it states that "the State Police Troop G reported that they received a call of a person shot at 49 Ridgewood Place," *id.* at ¶3, which call is also noted in the Police Incident Report, (Gov't Ex. 49); however, neither the Channel One recording nor any of the testifying officers indicated that report was relied on to assess the situation at 49 Ridgewood Place. The warrant affidavit also asserts that officers at the scene perceived "a heavy odor of marijuana" after they breached the door, which none of the testifying officers described at the hearing. Warrant Aff. at ¶ 7. With

respect to the contraband identified in the course of the protective sweep, the warrant affidavit

lists a "black handgun with blood on it," that was allegedly observed in an open closet, as well as

cash and a clear plastic bag with what appears to be cocaine in it. *Id.* On the basis of that

affidavit, the police obtained a search warrant for the residence. When executing the warrant,

officers found the considerable additional contraband that forms the basis of the instant charges.

Crime Scene Reports submitted on April 20, 2016 state that "a black handgun with blood

on it" or a "gun" was found during a protective sweep. *See* Crime Scene Report Narrative at 1–2,

(Gov't Ex. 51). One of those reports states that all of the contraband on the floor of the closet,

including the visible gun, was "found by Detective Martinez," whom I note did not testify to his

involvement in any protective sweep. *Id.* at 7. It is unclear from the report when that discovery is

asserted to have taken place. *Id.*

## II.    Discussion

Calhoun challenges the government's evidence on three primary grounds: first, the

officers' entrance into the residence was not justified by the exigent circumstances exception to

the Fourth Amendment's warrant requirement, which the parties agree is the only exception that

potentially applied; second, if the officers were lawfully on the premises, their search

nevertheless exceeded the scope of a permissible protective sweep under *Maryland v. Buie*, 494

U.S. 325 (1990); and third, that the contraband items described in the warrant affidavit were not

found pursuant to the plain view doctrine. The government disagrees with Calhoun's factual

contentions, and further argues that even if the initial entrance of the officers was improper, any

Fourth Amendment violation does not merit the application of the exclusionary rule.

For the reasons discussed below, I determine that the officers' entry was not justified by

emergency circumstances and thus was simply not permitted under the Constitution. Moreover,

there are strong indications that Bridgeport police officers blithely exceeded the permissible

scope of a protective sweep in order to find additional evidence in this case, and, more

troublingly, that the Department may have a practice of doing so. Finally, suppression of the

evidence at issue in this case cannot be avoided through the inevitable disclosure doctrine or

good faith reliance on the search warrant. Rather, suppression is appropriate to avoid creating an

incentive for officers to violate Fourth Amendment rights.

A.  Exigent Circumstances

A warrantless entry into a home is presumptively unreasonable under the Fourth

Amendment. *See Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984); *Payton v. New York*, 445 U.S.

573, 586 (1980). An arrest within the home is "simply too substantial an invasion to allow

without a warrant, at least in the absence of exigent circumstances . . . even when probable cause

is clearly present." *Payton*, 445 U.S. at 589. The government claims that the warrantless entry in

this case was justified by exigent circumstances. The parties agree that the relevant exigency is

described by the "emergency aid" doctrine, which has been articulated by the Supreme Court as

follows:

> Law enforcement officers may enter a home without a warrant to render
> emergency assistance to an injured occupant or to protect an occupant
> from imminent injury. This "emergency aid exception" does not depend
> on the officers' subjective intent or the seriousness of any crime they are
> investigating when the emergency arises. It requires only an objectively
> reasonable basis for believing that a person within the house is in need of
> immediate aid.

*Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (internal citations omitted) (quoting, *inter alia*,

*Brigham City v. Stuart*, 547 U.S. 398 (2006)). Thus, the defining characteristic of the emergency

aid doctrine is the officer's objectively reasonable belief in an "urgent need to render aid or take

10

action."[11] *Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003) (internal quotation and citation omitted). The reasonableness of an officer's belief that the situation was sufficiently urgent "must be assessed in light of the particular circumstances confronting the officer at the time." *Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011).

A closer examination of the facts in *Fisher* and *Brigham City* is instructive. In *Fisher*, officers responding to a complaint of a man "going crazy" inside of his residence arrived to find "a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside." 558 U.S. at 45–46. In addition, officers may have seen blood on the hood of the car, on clothes inside the car, and on the door to the property. *Id.* at 46. Inside the house, officers could see Fisher "screaming and throwing things" and could see that he had a cut on his hand. *Id.* In *Brigham City*, officers responding to a noise complaint saw minors drinking outside a residence, heard shouting coming from inside, and then saw four adults attempting to restrain a juvenile. 547 U.S. at 401. They then witnessed the juvenile punch one of the adults in the face, and saw the victim "spitting blood into a nearby sink." *Id.* "The other adults continued to try to restrain the juvenile, pressing him up against a refrigerator with such force that the refrigerator began moving across the floor," at which point the officers entered to intervene. *Id.*

The *Fisher* Court identified three similarities between the facts in that case and in *Brigham City* supporting a "straightforward application of the emergency aid exception" in both

---

[11] I note that the emergency aid doctrine differs somewhat from other exigent circumstances analyses because it does not necessarily involve a suspicion of wrongdoing at the moment that the police take action, and accordingly, does not depend upon probable cause or the availability of a warrant. *See See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 560 (7th Cir. 2014); *see also United States v. Williams*, 2015 WL 429087, at *9 (W.D.N.Y. Feb. 2, 2015), *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. May 29, 2015) (discussing same).

cases: (1) the officers were "responding to a report of a disturbance;" (2) the officers encountered a "tumultuous situation" at the scene; and (3) the officers could see "violent behavior inside" that could have resulted in harm to the subject or others. *Fisher*, 558 U.S. at 48. Those three factors can be understood collectively as indications of an ongoing threat of violence. The *Fisher* Court also observed that the officers in that case had found "signs of a recent injury, perhaps from a car accident" outside the scene, and rejected the lower court's determination that those "mere drops of blood" were insufficient to signal a sufficiently serious injury. *Id.*

In the present case, there was no indication of an ongoing threat. According to the testimony of the officers, at least fifteen minutes had passed since the reports of shots fired and the assault at the CVS. The officers had reason to believe that Calhoun, whom they identified as the "suspect" responsible for the disturbances several minutes before the breach, was inside his residence. During the period that the officers searched the area outside the residence—again, by Blackwell's testimony, a period of up to fifteen minutes—they heard no sounds coming from the residence and saw no signs of commotion or violence, and received no additional evidence of a person at risk—or even present—inside the home.

The government's concession that the emergency aid doctrine, rather than other theories of exigency, is the operative one here provides an important insight into the situation. The government does not contend that the officers were in hot pursuit of Calhoun and chased him to his house. It is easy to look at these facts and be concerned by the ongoing threat Calhoun may have posed to the people he assaulted and threatened to kill at CVS or by the danger to the community when shots are fired. But despite the fact that Calhoun's actions at CVS were abhorrent and violent, that situation had *ended* by the time the officers arrived at his residence. Unlike in other emergency aid cases involving domestic violence, by the time the officers

12

entered, Calhoun had voluntarily distanced himself from his victims, he was not continuing to show signs of rage, violence, or instability, and he did not threaten the police when they made their presence known. *Cf. Anthony v. City of N.Y.*, 339 F.3d 129, 136 (2d Cir. 2003) (officers received a 911 call from that address from a woman who claimed to be under attack); *Jackson v. City of N.Y.*, 29 F. Supp. 3d 161, 175–76 (E.D.N.Y. 2014) (officers received a distress call including report of gun and heard screaming from inside the house); *Hogan v. Buttofocco*, 2009 WL 3165765, at *1 (N.D.N.Y. Sept. 28, 2009), *aff'd,* 379 F. App'x 35 (2d Cir. 2010) (officers received a 911 call reporting domestic violence from a child, the potential victims were still inside the house, the house was in disarray, and aggressor resisted arrest); *see also City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1767 (2015) (emergency aid doctrine justified warrantless entry into residence of armed mentally-ill person threatening anyone attempting entry).

In the same vein, the reports of shots fired in the general area did not indicate an ongoing threat of violence at 49 Ridgewood Place. Contrary to the government's suggestion, the Fourth Amendment does not create a *per se* exception to the warrant requirement any time there is a report of shots fired nearby, even if the police believe they have located the person responsible for firing those shots; in every case, the totality of the circumstances must be examined. *Cf. Williams v. Cty. of Alameda*, 26 F. Supp. 3d 925, 938–39 (N.D. Cal. 2014) (holding that although reports of domestic violence should be taken seriously, they do not *per se* constitute exigency); *Harris v. O'Hare*, 770 F.3d 224, 236 (2d Cir. 2014) (The "mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency.") (emphasis in original). In cases holding that a report of shots fired provided sufficient exigency to justify a warrantless entry, the officers had an objectively reasonable belief that victims would be found at that

location because that was where the shots had been fired. *See United States v. Ashburn*, 2014 WL 1800409, at *5 (E.D.N.Y. May 6, 2014) (collecting cases that held emergency aid doctrine justified entry to search for shooting victims where there was evidence that shots had been fired, such as the presence of bullet holes and casings at the location); *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008) (collecting cases that held same, where there were bullet holes, casings, or reports of shots fired at the location). In the present case, by contrast, the evidence available to the officers on location at the time of the breach did not provide any indication that shots had been fired at the residence.[12] Instead, all of the available evidence suggested that Calhoun fired shots at a *different* location and then fled to his residence. The shots fired were reported before Calhoun drove away from the CVS, *see* (Gov't Ex. 2); there were no bullet holes visible on the residence or in the car; and after roughly fifteen minutes of searching, the officers had not found any casings in the area around the residence.

Accordingly, the warrantless entry must be wholly premised on an objectively reasonable belief that Calhoun or someone else in the residence was in *urgent need* of medical attention or other police aid due to signs of recent injury outside of the residence. The government suggests that it was objectively reasonable for the officers to believe that Calhoun or someone else in the residence had suffered a gunshot wound based on the shots fired calls and the few drops of blood outside.

I first address the possibility that there was a party at risk in the residence. At the hearing, the government suggested that its officers could have reasonably believed that Calhoun had shot a passenger in his car, perhaps taken that person hostage, and brought him or her into the residence. As in *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011), that speculative

---

[12] As noted above, the breaching officers did not appear to be aware of or rely on the report to State Police Troop G that a person had been shot at 49 Ridgewood Place.

assertion is "untethered to any facts in the record." *Id.* at 158–59. By the time of the breach, officers had spoken to the victims at CVS, who suggested that Calhoun may have hurt his hand on the car window, but did not suggest that he had shot himself or another party there, posed a specific risk of violence to another person, or had, in the aftermath of an ugly domestic dispute, also seen fit to undertake a kidnapping when driving the one-block distance from the CVS to his residence. As noted above, officers had examined the car and seen no evidence that a shooting had taken place inside of it, and the small amount of blood they could see in the car was on the front of the driver's seat and gearshift, not on any passenger seat where a kidnap victim would almost certainly have been held. And unlike in *Fisher*, where the Court held that officers could have reasonably believed Fisher's ongoing visible acts of violence were directed at other people in the residence, the officers in this incident were outside the residence for up to fifteen minutes without seeing or hearing any signs of commotion.

The evidence of recent injury found outside the residence also was not sufficient to provide a reasonable belief of an *urgent need* for care. The government's witnesses stated that their decision to breach was based on the "trail of blood" leading up to the residence, but the evidence does not show such a trail existed. The government's photographic evidence shows at most six or seven small smears of blood on the front seat of the car, one drop on the sidewalk about seven feet away from the car, and three drops on the porch. When the officers first radioed in the discovery of blood in the car, they described it as "not a lot" of blood, did not call medics at that time, and did not attempt to breach. It apparently took several more minutes to locate the drops on the sidewalk and porch, and even after additional blood was located, officers did not call for medical support. Indeed, medics were apparently summoned only on the suggestion of a dispatcher after Calhoun and the residence had been secured. Additionally, those few drops of

blood were not accompanied by any other indicia of urgency. In *Fisher*, the Court held that an officer could reasonably have concluded that the drops of blood on the car were the result of a recent car accident and that if Fisher was the injured party, he was "in his rage" unable to provide himself with care. 558 U.S. at 48–49; *see also Lagasse v. City of Waterbury*, 2011 WL 2709749, at *11 (D. Conn. July 12, 2011) (sufficient urgency when officers "observed through a partially opened door two bodies slumped over and unconscious on the floor" during what they believed was an ongoing burglary). Here, the officers had fairly strong evidence that the blood was the result of a cut to Calhoun's hand, and, at most, a theory that Calhoun might have accidently grazed himself with a bullet. They had no indication that he was in an ongoing rage that would prevent him from obtaining care for himself. To the extent that the officers relied on Calhoun's failure to respond to their requests for entry as a sign of urgency, they seem to forget that they had already identified Calhoun as a "suspect" in a recent violent assault and accordingly, his silence was far more likely to be a result of his desire not to be arrested.

The emergency aid doctrine does not require "ironclad proof of a 'likely serious, life-threatening' injury," *Fisher*, 558 U.S. at 49 (quoting *Brigham City*, 547 U.S. at 406), nor is a failure to immediately call for medics fatal to an emergency aid claim, *see id.*; nevertheless, the officers' objectively reasonable belief must be based on something more than speculation and the government has not shown that to be the case here. *See Simmons*, 661 F.3d at 158; *see also Williams v. Cty. of Alameda*, 26 F. Supp. 3d 925, 938 (N.D. Cal. 2014) ("Defendants must point to 'specific and articulable' facts which, taken together with rational inferences, support the warrantless intrusion.") (quoting *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987)).

 In sum, I find that the officers' warrantless entry into 49 Ridgewood was not justified by the emergency aid doctrine. No reasonable officer at the scene could have believed that a

medical emergency existed inside 49 Ridgewood Place—and I find that Borona's statement that he subjectively believed exigency existed was not credible. The government has not pointed to any other reason why a warrantless entry would be permitted in this case, nor did it provide evidence that it would have been impracticable to wait for Calhoun and arrest him upon his exit from the residence or to obtain a warrant for his arrest. Thus, for the foregoing reasons, I find the breach was a bad faith violation of the Fourth Amendment. For the sake of completeness, however, I will also discuss the scope of the officers' search within the residence before considering the implications of this finding for Calhoun's suppression motion.

B. <u>Scope of Search Incident to Emergency Aid</u>

Even if the officers had been entitled to enter the residence under the emergency aid doctrine, their search of the premises also appears to have exceeded the permissible scope in several concerning ways.[13]

The Supreme Court held in *Maryland v. Buie*, 494 U.S. 325 (1990), that arresting officers are permitted to engage in a protective sweep incident to the execution of an arrest warrant to ensure their safety. *Id.* at 334. The sweep must be justified by the circumstances, and limited to those spaces where a person, or other source of harm, could be found, and it must last "no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335–36. The Second Circuit has extended *Buie* to circumstances where "officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant, at least where their presence may

---

[13] In its Motion for Reconsideration, the government suggests that my discussion in this section suggests that I "credited the testimony that the narcotics and cash on the bed were legitimately observed during the protective sweep." Gov't Mot. for Recon. at 6. That statement ignores my previous determination that the officers were not entitled to be in the residence *at all* without a warrant—to be clear, the purpose of discussing *Maryland v. Buie* here is to highlight additional ways in which this warrantless search appears to have violated the Fourth Amendment, rather than to confer the benefits of the "plain view" exception to the contraband seen on the bed.

expose the officers to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant." *United States v. Miller*, 430 F.3d 93, 99 (2d Cir. 2005); *see also United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (holding that when officers have made a warrantless entry pursuant to exigent circumstances, any accompanying "warrantless search 'must be strictly circumscribed by the exigencies which justify its initiation.'") (quoting *Mincey v. Arizona,* 437 U.S. 385, 393 (1978)).

As a preliminary matter, it is important to note that not all of the officers who were apparently involved in searching Calhoun's residence before a warrant was obtained have even attempted to argue that they were engaged in a protective sweep as a result of exigent circumstances. Blackwell and Borona entered at least under the pretense of some exigency. Martinez and Amato both frankly admitted in their testimony that they arrived after the scene had been secured. Amato suggested in his testimony that he drove across town and arrived on the scene solely so that he could witness Calhoun being arrested. Still more concerningly, Martinez's testimony suggests that he is *routinely* called to do a walk-through after a protective sweep has been completed in order to better identify any guns seen on the premises. The practice of parading additional officers through a home after all agreed that the scene has been secured and without any other applicable exception to the warrant requirement appears to be plainly unconstitutional. *See Azana v. City of W. Haven*, 2012 WL 264559, at *7 (D. Conn. Jan. 27, 2012) (denying summary judgment on the issue of qualified immunity where the evidence could show that officers further intruded into a residence after the exigent circumstances had been resolved). Moreover, allowing expert-officers to "double-check" the accuracy and details of what other officers saw when they were conducting a protective sweep in order to strengthen a warrant affidavit belies the very foundation of the "plain view" exception, which is the "immediately

apparent" nature of the contraband. *See Horton v. California*, 496 U.S. 128, 136 (1990). As a result of the officers' admitted decision to walk through the residence after the scene was secured, there is now considerable doubt about what the other officers could have seen legitimately in the course of a protective sweep.

Had the officers who made the initial breach and warrantless entry done so legally pursuant to the emergency aid doctrine, they clearly would have been entitled to conduct a protective sweep of the residence. And there is no evidence beyond Calhoun's affidavit that those officers exceeded the scope of *Buie* by opening boxes and bags. *See United States v. Murray*, 2015 WL 7871358, at *4 (W.D.N.Y. Dec. 4, 2015) (giving little weight to a defendant's affidavit supporting a suppression motion not subject to cross-examination; collecting cases doing same); *see also United States v. Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999) (observing that, "in practice, the self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing"). But the government's witnesses offered inconsistent testimony regarding how much of the residence was searched and by whom before the officers themselves concluded that the need for a protective sweep had ended. For instance, Amato testified that Borona was in the kitchen when he arrived, but Borona testified that he only conducted a protective sweep of the front bedroom and bathroom before determining that there were no additional people in the residence. After a previous statement had refreshed his recollection, Borona also testified that he had been present in a back bedroom of the house, but he did not amend his earlier statement that he believed the need for a protective sweep had ended with his search of the other two rooms.

The government's evidence thus indicates that the officers' search of the residence lasted considerably "long[er] than [was] necessary to dispel the reasonable suspicion of danger," *Buie*,

494 U.S. at 335–36, and in fact amounted to wanton disregard for the limitations of a permissible

protective sweep.[14]

## C. Scope of Suppression

Having concluded that the warrantless entry into 49 Ridgewood Place was unlawful, I

must now determine whether any evidence should be suppressed as fruit of the poisonous tree

under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963);

*United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994). "The exclusionary rule prohibits

introduction into evidence of tangible materials seized during an unlawful search, and of

testimony concerning knowledge acquired during an unlawful search." *Murray v. United States,*

487 U.S. 533, 536–37 (1988) (internal citations omitted).

The government initially argued that the exclusionary rule should not apply in this case

either because: (1) the physical evidence[15] would have been found under the inevitable discovery

doctrine; or (2) the officers' violation of the Fourth Amendment was the result of negligence and

---

[14] Calhoun further argues that, in addition to exceeding the scope of a permissible protective sweep, the officers also improperly removed contraband from Calhoun's pockets and placed it on a bed in order to provide more support for their search warrant application. The only evidence of impropriety beyond Calhoun's affidavit, however, is Blackwell and Borona's potentially inconsistent testimony regarding who checked the front bedroom and saw the contraband on the bed, and I find that is insufficient to support Calhoun's account.

The government's response, however, raises additional concerns—it asserted in its initial opposition to Calhoun's suppression motion that there would have been no need for the officers to fabricate plain view evidence because "Borona had seen a gun in the back room closet." Gov't Opp'n Br. at 14. As discussed above, Borona's testimony regarding his discovery of a gun with blood on the handle on the floor of a closet in the back bedroom changed over the course of the hearing, and was inconsistent with the testimony of Martinez, who testified to the discovery of a different gun; moreover, Borona did not explain why neither gun was called in when Borona reported his discovery of other contraband over Channel One. And while they may not have material implications in this case, those inconsistencies remain concerning.

[15] The government does not appear to be arguing that any verbal statements Calhoun made during the warrantless entry, such as his alleged statement that "everything in the house is mine," would fall under the inevitable discovery doctrine or any other exception to the exclusionary rule.

accordingly does not require the strong deterrence effected by the exclusionary rule. In its

Motion for Reconsideration, the government further argues that the exclusionary rule should not

apply to all of the evidence either because: (3) the officers' conduct falls into the "good faith"

exception articulated by *United States v. Leon*, 468 U.S. 897 (1984), as applied by the Second

Circuit in *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) (en banc); or (4) the warrant

application contained sufficient untainted information to provide probable cause to search the

apartment for evidence of firearms.[16]

      As a preliminary matter, I discuss the general framework for evaluating exceptions to the

exclusionary rule. In order to best capture the ways in which the relevant doctrines overlap in

this case, I first consider the inevitable discovery and untainted warrant affidavit arguments, and

then turn to the remaining arguments, which raise more directly the question of good faith.

      1.   *Exceptions to the Exclusionary Rule*

      "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct

[violating the Fourth Amendment], or in some circumstances recurring or systemic negligence."

*Herring v. United States*, 555 U.S. 135, 144 (2009). Accordingly, the exclusionary rule is not a

"necessary consequence of a Fourth Amendment violation," *id.* at 141; instead, courts deciding

whether to impose that remedy must "focus[] on the efficacy of the rule in deterring Fourth

Amendment violations in the future," and ensure that the "the benefits of deterrence . . .

outweigh the costs" of its application, *id.* "The extent to which the exclusionary rule is justified

---

[16] Calhoun asserts that because the government did not timely raise any of those arguments, they should be deemed waived. I agree that the government's late invocation of those doctrines is not ideal, but I nevertheless determine that I may consider whether they apply here. *See United States v. Simmons*, 861 F. Supp. 2d 307, 312 n.5 (S.D.N.Y. 2012), *aff'd,* 543 F. App'x 101 (2d Cir. 2013) (where government raised inevitable discovery doctrine for the first time after remand, observing "that if the Court may consider new evidence it surely can consider a new legal theory based on the evidence that was before the Court at the time of the suppression hearing").

by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143; *see also Davis v. United States*, 564 U.S. 229, 240 (2011) (emphasizing the importance of police culpability in triggering the exclusionary rule).

The cases on which both parties rely raise a number of overlapping doctrines describing specific circumstances in which the exclusionary rule should not apply, including the independent source doctrine, the inevitable discovery doctrine, and a good faith exception. Those articulations are helpful to a point; however, as the Second Circuit observed in *United States v. Alvarez-Porras*, 643 F.2d 54 (2d Cir. 1981):

> despite the identification of discrete headings for the various exceptions, their applications and rationales overlap enough that we view them more as helpful guides than as rigid tests. In each case, we must weigh the extent of any illegality, the probative value of any legally obtained information, and the relationship between the two, always with the hope of vigorously enforcing the Fourth Amendment without imposing ineffective constraints on criminal investigations. . . . In this complicated area, it is wiser to let the cases speak for themselves and to encourage careful analysis and argument than to endorse vague headings which add little to our understanding of the problems and which, because of their symbolic impact, may lead inadvertently to a weakening of the Fourth Amendment's protection. In various ways, the issues of causation and good faith will undoubtedly enter into the court's handling of the exclusionary rule.

*Id.* at 60; *cf. United States v. Caraballo*, 831 F.3d 95, 103–04 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 654 (2017) (observing in the context of warrantless searches that "the ultimate touchstone of the Fourth Amendment is reasonableness, and the exigent-circumstances analysis is merely a finely tuned approach to Fourth Amendment reasonableness") (internal quotation marks and citations omitted).

Thus, I refer to specific doctrines here simply as a means of assessing the two crucial questions of whether the officers acted with sufficient culpability, and the extent to which any

conduct tainted by illegality and bad faith caused the discovery of the evidence that is the subject

of Calhoun's suppression motion.

### 2. *Inevitable Discovery Doctrine*

The government asserts that the evidence found in Calhoun's apartment should not be

subject to the exclusionary rule because it falls under the "inevitable discovery" doctrine—that is

to say, the illegal search was not the only possible cause leading to the discovery of that

evidence. "Under the 'inevitable discovery' doctrine, evidence obtained during the course of an

unreasonable search and seizure should not be excluded 'if the government can prove that the

evidence would have been obtained inevitably' without the constitutional violation." *United

States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix v. Williams,* 467 U.S. 431, 447

(1984)). "[I]llegally-obtained evidence will be admissible under the inevitable discovery

exception to the exclusionary rule only where a court can find, with a high level of confidence,

that each of the contingencies necessary to the legal discovery of the contested evidence would

be resolved in the government's favor." *Id.* at 60. The government has the burden to establish

inevitability by a preponderance of the evidence. *Id.* at 58 n.6 (quoting *Nix*, 467 U.S. at 444); *see

also id.* (discussing the "semantic problems in using the preponderance of the evidence standard

to prove inevitability").

In the context of a warrantless search, *United States v. Lavan*, 10 F. Supp. 2d 377

(S.D.N.Y. 1998), collects a useful list of the contingencies to be considered when applying the

inevitable discovery doctrine, including:

> whether a warrant would have been sought, whether a warrant would have
> issued, whether the warrant would have specified the articles seized,
> whether the articles would have remained in place by the time the warrant
> would have been executed, and whether the articles would have been
> found in the hypothetical warranted search . . . .

*Id.* at 389 (discussing, *inter alia*, *United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir. 1995)). The government's argument here relies heavily on the clear existence of probable cause to arrest Calhoun for various offenses including the possession of a firearm by a prohibited person, but fails to take most of *Lavan*'s remaining contingencies into account.[17] *See Heath*, 455 F.3d at 58 ("[E]vidence that an arrest would have been supported by probable cause and, therefore, could legally have taken place, only makes the inevitable discovery doctrine potentially applicable."). In particular, the government relies on cases in which the defendant was already legitimately in police custody and/or the premises to be searched were already functionally under police control and supervision when the improper search occurred. *See, e.g.*, *United States v. Whitehorn*, 829 F.2d 1225, 1228 (2d Cir. 1987) (agent was guarding the apartment after defendant was taken into custody); *United States v. Wolfe*, 2015 WL 8780544, at *5 (D. Vt. Dec. 15, 2015) (observing that "the scene inside was frozen and unlikely to change during the time it took to apply for a search warrant"); *United States v. Levasseur*, 620 F. Supp. 624, 627 (E.D.N.Y. 1985), *abrogated on other grounds by United States v. Heath*, 455 F.3d 52 (2d Cir. 2006) (house was searched for hidden persons before the illegal search, and agent testified that "he could have withdrawn all law enforcement persons to a safe distance from the house and kept it under surveillance"). The government accordingly fails to recognize that, in the absence of the warrantless entry, Calhoun would not have been secured and arrested during the period in which a search warrant was obtained, and so evidence—particularly the evidence of drug-dealing wholly unrelated to the assault charge for which the police had probable cause—could have been destroyed or hidden during that time. *See Cabassa*, 62 F.3d at 474 (holding, *inter alia*, that the "likely" possibility

---

[17] Taken to its logical limit, the government's position would support a rule that no warrant is required when one could be obtained. That is not the law.

that "evidence might disappear before the issuance or execution of a warrant" undermined the applicability of the inevitable discovery doctrine).

The government has failed to account for any number of contingencies that could have occurred before a search warrant was obtained. For instance, Calhoun could have left his house and been arrested while the weapon he used for the assault was on his person, thus obviating the need for a further search. *See United States v. Stokes*, 733 F.3d 438, 446 (2d Cir. 2013) (contemplating similar hypothetical where arrest would end the basis for searching the target premises). His mother, who also lived in the residence and whom the police had no reason to search, could have carried some or all of the evidence out of the apartment to a different location before the warrant was obtained. *See id.* (contemplating similar hypothetical where the target motel room had multiple registered guests). And there are further uncertainties regarding how a search pursuant to a warrant would have unfolded—for instance, because the search warrant likely would only have authorized a search for the gun used in the assault and other evidence related to that assault, it is uncertain whether and to what extent evidence of narcotics and the other weapons would have remained in plain view or would otherwise have been uncovered in the scope of that search. *See* 2 Wayne LaFave, *Search and Seizure* § 4.10(d) (5th ed. 2016) ("When the purposes of the warrant have been carried out, the authority to search is at an end."); *see also United States v. Canestri*, 518 F.2d 269, 274 (2d Cir. 1975) (holding that discovery of additional contraband was within the authorized scope of the search because the officers were "still looking" for the items described in the search warrant).

I can only speculate about the likelihood that any of those scenarios would have occurred, and, as the Second Circuit observed in *United States v. Stokes*, 733 F.3d 438 (2d Cir. 2013), "that is precisely the problem: a finding of 'inevitable' discovery cannot rest on speculation about

what [Calhoun] might or might not have done." *Id.* at 446. Because there was nothing inevitable about what would have been discovered absent the unlawful entry, the inevitable discovery doctrine does not apply here.

### 3. *Reliance on Untainted Information in the Warrant*

In its Motion for Reconsideration, the government now argues that the warrant that issued was based on sufficient untainted information to provide probable cause to search Calhoun's residence for a firearm, and therefore evidence found pursuant to that search warrant is admissible. *See* Gov't Mot. for Recon. at 6–8. The government concedes that a warrant application containing only untainted information would not have supported the issuance of a search warrant for drug-trafficking contraband or paraphernalia. Accordingly, a finding that a warrant would have issued to search for a gun would simply raise the same inevitable discovery questions discussed above with respect to that evidence—there would still be significant uncertainty regarding how much the scene might have changed before the warrant issued and how much drug-related evidence the police would legitimately have found pursuant to that warrant. As I noted in my initial Order, there is a much stronger argument that the warrant application could have supported a search warrant for the firearm Calhoun allegedly used in the assault at CVS; however, in that initial Order I failed to explain why that preexisting probable cause nevertheless does not allow the government to "cure" its Fourth Amendment violation with respect to the gun used in the assault at CVS.

The government's argument relies on the Second Circuit's instruction in *Laaman v. United States*, 973 F.2d 107 (2d Cir. 1992), that "[w]hen an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." *Id.* at 115; *see also United States v.*

*Marchand*, 564 F.2d 983, 994 (2d Cir. 1977) (collecting cases holding same). That principle is best understood as an elaboration of the independent source doctrine articulated by the Supreme Court in *Murray v. United States*, 487 U.S. 533 (1998).[18] In *Murray*, the Supreme Court held that evidence found as a result of an illegal search could nevertheless escape the exclusionary rule if it was also found a result of a search pursuant to a warrant that was "a genuinely independent source of the information." *Id.* at 542. To satisfy that standard, the Court required the lower court to find both that the decision to seek a warrant was not prompted by the illegal search and that the judicial officer's decision to issue the warrant was not "affected" by the fruits of that illegal search. *Id.*

Here I do not have sufficient evidence to find that either prong of *Murray*'s independent source test is met. First, the government did not present any evidence indicating that the officers would have sought a warrant to search Calhoun's residence for a firearm in the absence of their warrantless entry or that the scene would have been secured or even that the crime would have been treated as a priority. In part, that is the unfortunate result of raising this argument for the first time in a Motion for Reconsideration; however, it also reflects the contingencies remaining if the warrantless entry were removed from the equation—for instance, would the officers have merely sought an arrest warrant that could have been enforced at any time? Would the officers

---

[18] *Laaman* itself cites *Murray*, but does not expressly invoke its "independent source" doctrine. *See Laaman*, 973 F.2d at 115 ("To suppress evidence under such circumstances would 'put the police (and society) not in the same position they would have occupied if no violation occurred, but in a worse one.'") (quoting *Murray*, 487 U.S. at 541). Perhaps as a result of that omission, courts in the Second Circuit have not consistently understood the principle articulated in *Laaman* to be part of the independent source doctrine. *See United States v. Byam*, 2013 WL 4459002, at *1 (E.D.N.Y. Aug. 15, 2013) (suggesting the *Laaman* principle and the independent source doctrine are alternative means of avoiding the exclusionary rule); *but see United States v. DePonceau*, 2008 WL 222520, at *11 (W.D.N.Y. Jan. 24, 2008), *report and recommendation adopted*, 2008 WL 624110 (W.D.N.Y. Mar. 5, 2008) (describing the *Laaman* principle as falling "under" the independent source doctrine). Following the reasoning laid out by the Second Circuit in *United States v. Alvarez-Porras*, 643 F.2d 54 (2d Cir. 1981), above, the principle articulated in *Laaman* addresses the same intersection of good faith and causation implicated by the independent source doctrine, and accordingly, is best understood as a further articulation of that doctrine.

27

have secured the premises while a search warrant was obtained? Would they still have had probable cause to search the residence if Calhoun was arrested with a gun on his person or had time to move it to another location?

Second, it is difficult for me to find that the state judge did not rely on the tainted information in the warrant affidavit when issuing the warrant. In cases in which courts held that the judicial officer's decision was not "affected" by the tainted evidence, that evidence played a small or nonexistent role in the warrant affidavit. For instance, in *Murray* itself, the tainted evidence had been wholly omitted from the affidavit. *See* 487 U.S. at 542–543. In *Laaman*, detailed evidence drawn from a four-year long investigation of the defendant provided sufficient support for the warrant. *See* 973 F.3d at 115–16.

In the present case, by contrast, the tainted evidence plays a central role. Without the tainted information, the affidavit establishes at most that Calhoun, who was prohibited from possessing a firearm, threatened three women with a firearm in a CVS and then drove back to his house. *See* Warrant Aff. at ¶¶ 3–6, 8–15 (Gov't Ex. 51). The tainted information pinpoints the location of that firearm—it includes visual confirmation by police officers that the gun was in fact in the residence, *see id.* at ¶ 7, in addition to other contraband. Without that evidence, there would be considerable uncertainty regarding the location of the gun. The affidavit does not rule out the possibility that Calhoun could have tossed the gun on the drive home, left it in his car, or otherwise disposed of it while the warrant application was pending.

Thus, I conclude that the presence of untainted evidence in the warrant affidavit arguably providing probable cause to search Calhoun's residence for a gun does not "cure" the presence of significant tainted evidence therein.

4. *Good Faith Exception*

Next, I take up the government's argument that the exclusionary rule should not apply here because the officers' misconduct was the result of "isolated negligence," and accordingly application of the rule would not result in "appreciable deterrence." Gov't Opp'n Br. at 7 (discussing *Herring*, 555 U.S. at 139–40).

Thus far, in cases where the Supreme Court has determined that a "good faith" exception to the exclusionary rule should apply, the law enforcement officer responsible for the Fourth Amendment violation was unknowingly relying on errors made by others, such as warrants obtained using erroneous information, or statutes or judicial precedents later held to be invalid. *See Davis*, 546 U.S. at 238–39 (collecting cases); *see also United States v. Mota*, 155 F. Supp. 3d 461, 475 (S.D.N.Y. 2016) ("The common thread uniting these exceptions is that it was not the officer conducting the search who erred, but another actor, such as the legislature.") (citing *Davis*, 546 U.S. at 240–41).

There is no comparable reliance in the present case. The government does not argue that the breaching officers acted innocently on misinformation or that they relied on a now-overturned precedent.[19] More importantly, it is fairly clear that the officers knew they had

---

[19] The government suggested that I could find that the breaching officers acted in good faith based on a reasonable mistake of law. *See* Gov't Post Hearing Br. at 10 (discussing *Heien v. North Carolina*, ––– U.S. –––, 135 S. Ct. 530 (2014)). In *Heien*, the Supreme Court held that "[t]he Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or law—must be *objectively* reasonable." *Id.* at 539 (emphasis in original). The *Heien* Court, however, was considering whether an officer's reasonable mistake of law meant that there had been "no violation of the Fourth Amendment in the first place," rather than whether the exclusionary rule should be imposed as the proper remedy for that violation. *Id.* Accordingly, the inquiry contemplated in *Heien* has already been conducted through my previous determination that a Fourth Amendment violation did occur here.
  Moreover, the emergency aid doctrine already requires a consideration whether the officers had an "objectively reasonable" basis for their belief that the situation required urgency. *See Fisher*, 558 U.S. at 47. The government's mistake of law argument thus urges that, although the officers did not have an objectively reasonable basis for that belief, they *did* have an objectively reasonable belief that their belief in an emergency would be found to be objectively reasonable. That argument is nonsensical bootstrapping.

probable cause and could likely have obtained both an arrest warrant and a search warrant, but chose not to do so. *See Stokes*, 733 F.3d at 443–44 (applying the exclusionary rule where officers had probable cause, could have arrested the defendant in public, and made a "deliberate strategic choice" not to do so). They were already referring to Calhoun as a "suspect" before they breached his residence.[20] *See* (Gov't Ex. 1). As I discussed at length above, they had no objectively reasonable basis to believe he needed urgent medical care or posed an urgent threat to others. They simply chose not to wait for Calhoun to come outside or for the process to obtain a warrant to run its course.

In its Motion for Reconsideration, the government relies on *United States v. Leon*, 468 U.S. 897 (1984), to argue that I misconstrued its "good faith" reliance argument by focusing my inquiry on the breaching officers' culpability when they made their warrantless entry, rather than considering their state of mind when they subsequently applied for and relied on a warrant.[21]  *See* Gov't Mot. for Recon. at 1–2. On closer examination, however, it becomes clear that *Leon* and its progeny simply articulate another way in which the lack of officer culpability may be shown—and because the officers in this case did not act with the requisite good faith, that exception, too, does not apply.

In *Leon*, the Supreme Court held that the exclusionary rule does not apply when an officer in good faith seizes evidence pursuant to a facially valid warrant that later turns out not to

---

[20] Sergeant Amato's testimony further suggests that Calhoun was well-known to the Bridgeport Police Department and that Amato, at least, expected to find evidence of other crimes in the residence, although it is unclear the extent to which the breaching officers were aware of that history.

[21] I note that none of the officers who breached the residence was an affiant on the warrant application. To the extent that was a deliberate choice so that the officers applying for the warrant could take advantage of the good faith exception by claiming that they were unaware of the misconduct of their colleagues, it is, again, a concerning one.

support probable cause. *See* 468 U.S. at 922–23. The *Leon* Court reasoned that in cases where a judicial officer improperly issued a warrant on less than probable cause, the person whose conduct the law wishes to deter is that judicial officer, rather than the officer who was attempting to comply with the Fourth Amendment's requirements by seeking a warrant. *See id.* at 916–17. The *Leon* Court recognized, however, that simply seeking a warrant was not *per se* evidence of the officer's good faith, and observed that suppression would "remain an appropriate remedy if [*inter alia*] the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

The Second Circuit has somewhat controversially applied *Leon*'s good faith exception to circumstances where the warrant affidavit included information arguably tainted by a Fourth Amendment violation, if it would nevertheless be objectively reasonable for the officers to believe that the resulting warrant had validly issued.[22] *United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) (en banc). In order to establish that objective reasonableness, however, the "officers must, *inter alia*, disclose all potentially adverse information to the issuing judge." *Id.*

---

[22] Other courts have strongly disagreed with the proposition that evidence obtained in a warrantless search in violation of the Fourth Amendment may ever be "cured" by the subsequent approval of a judicial officer. *See, e.g.*, *United States v. Gray*, 302 F. Supp. 2d 646, 653 (S.D.W. Va. 2004) ("Regardless of whether an officer concealed or confessed the circumstances of the predicate search, he should bear responsibility for any illegality occurring prior to the issuance of the warrant. A magistrate's chambers is not a confessional in which an officer can expiate constitutional sin by admitting his actions in a well-drafted warrant application."); *United States v. Jackson*, 2004 WL 1784756, at *5 n.3 (S.D. Ind. Feb. 2, 2004) ("The Fourth Amendment and exclusionary rule would do little to discourage police violations if the police were free to violate the Fourth Amendment and then, without consequence, use illegally obtained evidence to obtain a search warrant. When the police apply for a search warrant, the job of the magistrate is to determine whether the evidence shows probable cause for the search, not to investigate whether all the evidence presented was obtained in a constitutional manner. The magistrate's later decision to issue a search warrant cannot insulate the earlier warrantless searches from application of the exclusionary rule.").

Nevertheless, *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016), makes clear that a more expansive application of *Leon* remains good law in this circuit.

(citing *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996), *aff'd and amended*, 91 F.3d

331 (2d Cir. 1996)). The extent of the disclosure serves as a proxy for officer culpability.

Accordingly, in those cases where the officers fully disclosed their conduct and their Fourth

Amendment violations could fairly be classified an innocent or negligent error due to the murky

state of the law, the officers were given the benefit of the good faith exception, *see Ganias*, 824

F.3d at 225–26; *United States v. Thomas*, 757 F.32d 1359, 1368 (2d Cir. 1985); *United States v.*

*McClain*, 444 F.3d 556, 565 (6th Cir. 2006); whereas officers who did not provide full

disclosure, and whose conduct clearly and deliberately violated the Fourth Amendment were not

given that benefit simply because they later managed to get a warrant issued, *see Reilly*, 76 F.3d

at 1280. Again, the government has not presented any new legal or factual argument that would

change my determination that the officers' Fourth Amendment violation was a deliberate attempt

to circumvent the warrant requirement and did not rely on an objectively reasonable belief in

exigency.

A comparison of the facts underlying the cases on which the government relies to the

present circumstance underscores the point. The government's argument relies primarily on the

*en banc* opinion in *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016), which in turn focused

on two cases—*United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996), and *United States v. Thomas*,

757 F.32d 1359 (2d Cir. 1985). In *Reilly*, where officers provided only a "bare-bones"

description of their intrusion on the defendant's property, obscuring the fact that they had made a

warrantless search of curtilage, the good faith exception did not apply. 76 F.3d at 1280. In

*Thomas*, by contrast, where the officers conducted a warrantless canine sniff, disclosed that sniff

in their affidavit, and the Circuit only subsequently held, as a matter of first impression, that the

sniff was a warrantless search, the good faith exception did apply. 757 F.2d at 1368. The *Ganias*

*en banc* panel viewed the case before it as more akin to *Thomas* because it determined there had been a full disclosure of all relevant information to the judicial officer and no "significant reason to believe" that the government's actions in retaining the fruits of an earlier search had been unconstitutional. 824 F.3d at 224; *see also United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) (good faith exception applies where the officers "fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search").

The present case, however, is more akin to *Reilly* than *Thomas*. In particular, the *Reilly* Court repeatedly emphasized the importance of providing the reviewing court with "all potentially adverse information" in order to merit an exception for good faith reliance on the ensuing warrant. 76 F.3d at 1280. Contrary to the government's repeated assertions in its Motion for Reconsideration, however, the officers here did not make a full disclosure of their constitutional violation. Like in *Reilly*, the officers provided a description that omitted crucial details of the officers' own conduct; moreover, the officers here also included additional information to suggest the officers had much stronger indications of urgency before the breach. The warrant affidavit describes "blood droplets on [Calhoun's] vehicle that led to the front entrance door [of Calhoun's residence]," Warrant Aff. at ¶ 6, Gov't Ex. 51, but it does not disclose that officers had identified Calhoun as a "suspect" before they reached his residence; nor that they searched outside of the residence for fifteen minutes without finding any spent shell casings or any other signs of on-going disturbance; nor that the "drops of blood" in the car were initially described by the discovering officer over the radio as "not a lot" of blood; nor that the putative trail that "led" to the residence took the officers several minutes to locate and consisted of only a single drop on the sidewalk and perhaps three more at the threshold to the residence several feet away. Further, the affidavit states that State Police Troop G "received a call of a

33

person shot at [Calhoun's residence] and relayed this information to the Bridgeport Police," *id.* at ¶ 3, without disclosing that the breaching officers did not know or rely on that information when they made their warrantless entry, and further asserts that the breaching officers smelled marijuana outside the residence, *id.* at ¶ 7, a claim omitted by every officer testifying before me.

Indeed, the affidavit does not even directly disclose that the officers made a warrantless entry under the belief that someone inside the residence was in urgent need of assistance; although that is implied as the most likely explanation for the officers' conduct, the affidavit also describes the events leading up to the breach in a manner that could suggest the officers were in hot pursuit of an assailant, or that they were entering as a result of the heavy marijuana smell. And assuming that the judge was evaluating the warrantless entry through the lens of the emergency aid doctrine, the affidavit dramatically overstates the urgency of the situation—of course, a reviewing judge presented with a reported shooting *on site* accompanied by a clear trail of fresh blood leading to the door of the residence could reasonably have determined that the emergency aid doctrine applied, but that is a seriously misleading description of the circumstances at the time of the breach. Moreover, because the emergency aid doctrine differs from other exigent circumstances exceptions precisely because it is generally concerned with preventing harm, rather than catching suspects or preserving evidence, the officers should have been aware that their reliance on that doctrine in order to enter the home of a person they had already identified as a "suspect" and in order to locate that "suspect" required particularly close scrutiny. Instead, the warrant affidavit fails to clearly indicate that the breaching officers expected to find a "suspect" inside the residence. In sum, the warrant application so significantly distorted the circumstances at the time of the breach that it made the judge "unaware of the constitutional violation," which is "equivalent to misleading the magistrate by falsities in the

34

affidavit or statements that are in reckless disregard of the truth under the first *Leon* scenario." *United States v. Massi*, 761 F.3d 512, 531 (5th Cir. 2014).

*Thomas* and *Ganias* are also distinguishable because both involved Fourth Amendment violations that had not previously been clearly established, and accordingly the Court wanted to clarify the state of the law without punishing the officers for crossing a previously un-established line. *See Reilly*, 76 F.3d at 1273 (observing that *Leon*'s good faith exception allows courts to "correct erring magistrates and provide them with guidance without incurring the social cost of letting the guilty profit from decisions that define the boundaries of the Fourth Amendment"); *see also McClain*, 444 F.3d at 566 (refusing to apply the exclusionary rule in that case "because the facts surrounding the initial Fourth Amendment violation were close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable") (internal quotation marks and citation omitted). In *Thomas* and *Ganias*, the Second Circuit was deciding novel questions at the very edge of Fourth Amendment law. For instance, after *Thomas* was decided, numerous other courts criticized the Second Circuit's determination that there had been a Fourth Amendment violation at all in that case. *See United States v. Lingenfelter*, 997 F.2d 632, 638 (9th Cir. 1993); *United States v. Colyer*, 878 F.2d 469, 475 (D.C. Cir. 1989); *United States v. Olivas*, 2009 WL 2169893, at *6 (W.D. Tex. July 17, 2009). Similarly, in *Ganias*, although the Court declined to rule on the issue, its extensive discussion of the complexity presented by computer data in that case suggests that the Court was unsure whether a Fourth Amendment violation had occurred at all.

In the present case, by contrast, the breaching officers' Fourth Amendment violation did not occur in a legal gray area. It was in the course of a warrantless entry into a suspect's home, where Fourth Amendment protections are at their peak. *See Payton*, 445 U.S. at 585 (observing

35

that "physical entry of the home is the chief evil" addressed by the Fourth Amendment) (internal

quotation marks and citation omitted); *see also United States v. Brown*, 2017 WL 444338, at *12

(M.D. La. Jan. 31, 2017) (holding that a warrantless entry based on circumstances that did not

give rise to an objectively reasonable belief in exigency "does not even *approach* the 'line of

validity'" required to trigger *Leon*'s good faith exception) (emphasis original); *United States v.

Meixner*, 128 F. Supp. 2d 1070, 1077–78 (E.D. Mich. 2001) (same).

In sum, like in *Reilly*, the officers' conduct during the pre-warrant search "raise[d]

serious doubt about the officers' good faith at that earlier time." 76 F.3d at 1280. The officers

here appear to have deliberately overstated an exigency in order to circumvent the warrant

requirement. And without a full account of the warrantless entry and sweep, the judge "could not

possibly decide whether their conduct was sufficiently illegal and in bad faith as to preclude a

valid warrant" such that *Leon*'s good faith reliance exception might apply.  *Reilly*, 76 F.3d at

1280.

### 5.  *Policies behind the Exclusionary Rule*

Finally, I return to the policies behind the exclusionary rule. Suppression of this evidence

serves the interest of deterring future objectively unreasonable and overly intrusive law

enforcement activity. *See Leon*, 468 U.S. at 919–20. The officers in this case arrived at

Calhoun's residence in order to arrest him for his participation in an earlier violent assault, and

made a deliberate decision to force their way into his home. But the Supreme Court has been

clear that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent

exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*,

445 U.S. at 590. As the district court in *United States v. Brown*, 2017 WL 444338 (M.D. La. Jan.

31, 2017), observed in a similar recent case:

> Suppression of the evidence seized in this case may deter future
> constitutional violations by sending a clear message that officers must
> articulate *sincere* and *reasonable* exigent circumstances to justify crossing
> that sacred threshold without a warrant. Suppression of the evidence
> seized in this case also may deter future constitutional violations by
> conveying that officers may not sanitize an unconstitutional and unlawful
> search by obtaining a warrant through the misrepresentation of the facts
> surrounding the unlawful search to a magistrate.

*Id.* at *17; *compare United States v. Dawson*, 2013 WL 1332573, at *15 (E.D. Ky. Mar. 15,

2013), *report and recommendation adopted,* 2013 WL 1320773 (E.D. Ky. Mar. 29, 2013) (even

if exigent circumstances had not applied, observing that *Leon*'s good faith exception would have

applied because the officers "acted with dispatch and care in assessing the situation" and "[a]t

worse, the officers misjudged the degree of emergency, something that could rise to nothing

more than negligence").

Indeed, failure to apply the exclusionary rule in this case would actually incentivize more

illegal searches. The Second Circuit has observed that, outside of exceptional cases, "to allow

officials to make an unlawful search and then repeat the search pursuant to a warrant would

sanction the very misconduct the exclusionary rule was intended to proscribe." *See Alvarez-*

*Porras*, 643 F.2d at 65 (but finding that was an unusual case) (internal quotation marks and

citation omitted); *see also Murray*, 487 U.S. at 546–47 (Marshall, J. dissenting) (asserting that

permitting illegal "confirmatory" searches on the basis of probable cause that can later be

"cured" with a warrant incentivizes the police to conduct *more* illegal searches because the

police will have "have little to lose and much to gain by forgoing the bother of obtaining a

warrant and undertaking an illegal search"). Taking the government's reasoning to its logical

conclusion could essentially eliminate the warrant requirement—and the associated protection of

review by a neutral judicial officer—in any case where officers already have probable cause. *See*

*Alvarez-Porras*, 643 F.2d at 64 (warning that an overly expansive reading of the inevitable

discovery doctrine "could be used to justify searches simply on the basis of probable cause and reasonableness, without regard for the warrant requirement, because the officers conducting the search were correct in believing they had a lawful basis for the search").

In cases like the present one, where Calhoun's actions and his unlawful possessions suggest his participation in violent and unlawful acts, it is tempting to give the police a pass for their search. But the Fourth Amendment requires otherwise. Imposing the exclusionary rule here underscores that even those people credibly suspected of committing serious crimes are entitled to privacy in their homes absent exigent circumstances or the issuance of a warrant.

I also note that because of the nature of the officers' Fourth Amendment violation, the costs of imposing the exclusionary rule are somewhat reduced—because the officers already had independent probable cause to arrest Calhoun. Unlike in the hypothetical case imagined by the *Herring* Court, Calhoun almost certainly will not "go free" simply because his suppression motion is granted. 555 U.S. at 141 (quoting *Leon*, 468 U.S. at 908). Even without the contraband seized at his residence, there appears to be ample evidence that Calhoun used a weapon to assault and threaten to kill three women and to damage their property.[23] That is a serious offense—in fact, some would argue that brandishing a firearm and threatening to kill three people is much more serious than drug-dealing.

At the hearing, the government suggested that another cost of imposing the exclusionary rule in this case is that it could have the effect of causing officers to hesitate before providing aid out of concern that the emergency aid doctrine would not apply. But the emergency aid doctrine,

---

[23] In the initial version of this Order, I also noted that there was ample evidence that Calhoun had violated 18 U.S.C. § 922(g)(1) as a felon in possession of a firearm. The government has subsequently pointed out that it will have difficulty showing that the weapon travelled in interstate commerce without access to that weapon; accordingly, I have now omitted that observation from this Amended Order. Nevertheless, there remains ample evidence with which state authorities can charge Calhoun with serious, violent crimes.

unlike other theories of exigency, contemplates a calculation that does not take into account the possible criminal conduct of the person believed to be in need—it is aimed at the provision of medical care and harm prevention, rather than the identification of suspects and evidence. Thus, exclusion of evidence from a criminal trial should have no effect on the willingness of officers to render emergency aid.

In sum, I conclude that the deterrent effect of imposing the exclusionary rule easily outweighs its costs in this case. Accordingly, any verbal and physical evidence obtained during the warrantless search of Calhoun's residence is suppressed.

**III.    Conclusion**

The government's Motion for Reconsideration (doc. 61) is **granted**. On reconsideration, Calhoun's motion to suppress (doc. 31) is **granted** by this Amended Order.

So ordered.

Dated at Bridgeport, Connecticut, this 21st day of March 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge